HOWARD R. PRICE, SBN 41522
9663 Santa Monica Blvd, Suite 1250
Beverly Hills, CA 90210
Telephone: (310) 277-8438/Fax: (323) 935-5017
email: hrprice@aol.com

DANA M. COLE, SBN 89105
COLE & LOETERMAN
1801 Century Park East, Suite 2500
Los Angeles, CA 90067
Tel: (310) 556-8300 / Fax: (310) 772-0807
email: dana@danacolelaw.com

Attorneys for Defendant,
ANTHONY MARK BROWN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 21-CR-00447-VAP |
| Plaintiff, | |
| vs. | DEFENDANT ANTHONY BROWN'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT |
| ANTHONY MARK BROWN, | |
| Defendant. | Date: July 25, 2022<br>Time: 9:00 a.m. |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

II.  THE PLEA AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

III. THE COURT SHOULD IMPOSE A 60 MONTH SENTENCE . . . . .   3

     a.   The Specific Offense Characteristic Unfairly Overstates
        the Defendant's Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

     b.   The Defendant is Selectively Prosecuted Because of His Status
        As a Police Officer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

     c.   The Defendant Is Not a Pedophile and Is Not a Risk to Re-Offend   4

     d.   The Defendant Is a Man of Good Character and Has Lived a
        Life of Good Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

     e.   Service of a Prison Sentence Will Be Very Difficult and Stressful
        For the Defendant Because He was a Police Officer and Because
        Of the Type of Offense He Committed . . . . . . . . . . . . . . . . . . . .   7

     f.   The Defendant's Age and Health Problems Will Also Affect
        His Incarceration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

     g.   The Recommended Fine of $25,000 is Excessive and Unjustified   8

     h.   The Recommended Lifetime Supervised Release Is Unnecessary
        And Unjustified . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

IV. PRISON DESIGNATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

ATTACHMENTS:

- Exhibit A:  Psych Evaluation by Richard Romanoff, Ph.D

- Exhibit B:  Character Letters

- Exhibit C:  Declaration of Jack Donson, BOP prison consultant

1

**I**

**INTRODUCTION**

This case involves the classic example of a good person doing a bad thing.

The defendant, at the time a Long Beach Police Department officer, accessed by cell phone the MeWe website and engaged in texting about, and viewing, sending and receiving "child pornography," technically termed Child Sexual Abuse Material (CSAM). The matter was investigated by Long Beach Police Department Investigator Laurie Barajas. As best as can be determined from her reports, this conduct sporadically occurred over a period of about six months and involved a relatively small amount of CSAM when compared to all of the other images on the phone that were otherwise lawful.  In fact, the Indictment cites only *six images* (five photographs and one extremely short video-clip). The Government has not provided in discovery any other images concluded to be CSAM.

On May 15, 2020, Investigator Barajas, presumably because of the small amount of CSAM (and not aware at the time that he was a LBPD officer), contacted the defendant by telephone, informed him of her discovery of his conduct and "explained to him that the investigation would be closed, but if [she] received another complaint involving him," the matter "would be presented for felony filing consideration." The defendant stated he understood "and never denied or questioned why [she] was calling him."  The defendant then deleted all of the subject data on his phone and never engaged in such conduct again.

On March 17, 2021, after discovering that the defendant was a police officer, a felony complaint was filed in the Los Angeles Superior Court alleging four counts of violation of Penal Code section 311.11(a) (possession of child pornography), an offense punishable by state prison (16 months, two or three years) or one year in county jail, or by fine of $2,500, or both the fine and imprisonment. Under Penal Code section 17(b), the offense is an alternative felony/misdemeanor ("wobbler") and thus could result in a misdemeanor conviction, either at the time of sentencing or after the successful conclusion of probation.

However, on September 27, 2021, the complaint was dismissed upon the  District

1   Attorney's request as the defendant had been indicted herein on September 21, 2021.

2                                         **II**

3                            **THE PLEA AGREEMENT**

4           Pursuant to the Amended Plea Agreement, on March 21, 2022 the defendant

5   pleaded guilty to one count of Distribution of Child Pornography 18 U.S.C.

6   §2252A(a)(2)(A). When sentenced, two counts of Distribution and one count of

7   Possession of child pornography will be dismissed. The parties agreed that the Guideline

8   Offense Level would be 27 with a range of 70 to 84 months incarceration, and that the

9   Government would recommend the low end of 70 months. The defendant reserved the

10  right to seek a variance/departure below the Guideline calculation.

11          The offense carries a mandatory minimum sentence of 60 months. The Presentence

12  Report recommends a variance and that the Court impose a 60 month sentence. For the

13  many reasons stated below, the defendant agrees with the Probation Officer's

14  recommendation.

15                                        **III**

16              **THE COURT SHOULD IMPOSE A 60 MONTH SENTENCE**

17          A number of factors and considerations warrant the mandatory minimum 60 month

18  sentence.

19          **A. <u>The Specific Offense Characteristic Unfairly Overstates the Defendant's</u>**

20          **<u>Conduct</u>**.

21          The Guideline calculation included a two level increase because the offense

22  involved 10 to 150 images [USSG §2G2.2(b)(7)(A)]. Under the Guidelines, a video-clip

23  constitutes 75 images. One of the six involved CSAM is a video clip that is a *just  a*

24  *fraction over a second in duration*. But for this exceptionally short (if not fleeting) image,

25  the Guideline calculation would be Level 25 with a range of 57 to 71 months. Given that

26  flicker of a video-clip, it is not significantly distinguishable from the other still images,

27  and thus the weight given to it unfairly overstates the offense conduct as being more

28  extensive than it really was.

1    **B.  The Defendant Is Selectively Prosecuted Because of His Status as a Police**
2         **Officer.**

3         The Defendant has never denied that he violated the law. However, it cannot be
4    seriously denied that his conduct–the very small amount of CSAM–does not ordinarily
5    result in a federal prosecution for distribution of child pornography.[1] Counsel is unaware
6    of any such prosecution based on such a small amount of CSAM. It can only be
7    concluded that this matter got the attention of the United States Attorney solely because
8    of the defendant's status as a police officer. While it is true that society may justifiably
9    hold  peace officers to a higher standard than ordinary citizens, it is equally true that
10   peace officers are human beings also subject to the very same human flaws causing bad
11   decisions and conduct. Here, the defendant was initially prosecuted in state court for
12   *simple possession* of child pornography, as is typical in such small cases, and without
13   doubt would have received a probationary sentence that ultimately would have allowed
14   the conviction to become a misdemeanor under state law and practice.  To be clear, this
15   is said not to minimize the turpitude of the defendant's conduct, but rather to contend that
16   a five year sentence, compared to a state court prosecution, is highly disparate.

17        **C.  The Defendant Is Not A Pedophile and Is Not A Risk to Re-offend.**

18        Submitted herewith is a recent and thorough psychological evaluation prepared by
19   Dr. Richard Romanoff, who is a preeminent court-qualified evaluator, having been
20   retained by both defendants and government attorneys (state and federal) in a myriad of
21   cases over the past 35 years. (See Exhibit A)  At first, it is hard to take exception with
22   the Government's recommendation for a low-end guideline sentence, e.g. 71 months,
23   because the defendant was a veteran police officer and "should have known better."  But
24   ironically, as stated in Dr. Romanoff's report, the opposite is more accurate:

25        • "Some answers reflected ongoing internal confusion over why he behaved as he
26          did in this case. I did not get a sense he was consciously withholding information
               in an effort to avoid criminal responsibility. Rather, on these occasions, despite
27             this confusion, he consistently acknowledged his involvement in his offense

28        _____

         [1]  Counsel unsuccessfully asked the AUSA to learn the criteria used by the
United States Attorney in deciding whether to indict for distribution of child
pornography.

4

related behavior, expressed deep feelings of shame and remorse for this behavior, and concurrent feelings of anger and deep disappointment in himself." (p. 4);

- "He described how during this time he was becoming increasingly disenchanted with work, especially since George Floyd, explaining, "I didn't want to talk to people [referring to the general public], there was a lot of hatred being directed to me." He then explained, "I started [to work as a police officer] at 19, I was one year out of high school, and I took an oath to help people, but that was becoming impossible, so I was just wanting to call it quits." " (p. 5);

- "Again, pressed about why he thinks he crossed the line into viewing and forwarding child pornographic images he said, "I'm a very low-key personality, I'm not a Type A, I'm a Type C, and I joined [the police force] way too young, and I saw a lot of stuff, dead bodies, I was seeing that for nine years." He then explained the primary reason he asked to be transferred to the airport flowed from his growing need to extricate himself from involvement in cases that exposed him to these types of images. Describing his reaction to those experiences at the time he said, "I shouldn't have seen that kind of stuff, and it ruined a lot of relationships, because I couldn't care about people, even with my wife." He then described a pattern of change in him, that came to include a shift from him being an unusually "empathic" person, who genuinely enjoyed engaging with and helping others, to him becoming closed off from feelings in a  way that left him feeling increasingly alienated, and "hating myself." " (p. 8);

- "Asked why he never went to see a therapist to discuss what even he obviously saw as evidence of a post traumatic reaction he said, "That's my fault," adding, "I probably should have gone to see someone," and, "The department had a psychologist, but no one went, everyone felt they'd go to management, and then you'd be taken off patrol, and put at the front desk, and then everyone  would know you're having problems."(p. 12);

- "Mr. Doma [the defendant's LBPD partner] began to provide information indicating significant sources of stress and distress Mr. Brown has been feeling for many years. For example, asked by me if he felt hated by members of the public, without pausing he immediately said, "We all feel that, and we talked about that all the time, how the community has changed, how we're just trying to do the right thing, but there's this lack of appreciation, we both felt the same way." He then said, "I think Tony felt beaten up, exhausted," as he then added, "that he didn't show it much, but we talked about it, that the whole world was changing."  "(p. 17);

- "Mr. Brown obtained a Static 99R score of 0 (-1 for young; 0 for single; 0 for index nonsexual violence; 0 for prior nonsexual violence; 0 for prior sex offenses; 0 for prior sentencing dates; 1 for any convictions for noncontact sex offenses; 0 for any unrelated victims; 0 for any stranger victims; and 0 for any male victims). There is a ninety-five percent chance that his actual recidivism risk level is between 2.2% and 3.5 percent over a five-year period of time. This score would place him in the lowest risk category for committing a future sexual offense as computed by the Static-99R." (p. 19);

- "There is evidence to indicate that over the course of the 36 years he spent working

as a reserve police officer, [nine years] and a full-time police officer [27 years] he experienced a variety of traumatic experiences and was also subjected to an additional collection of work related stressors that began to eat away at his previously higher level of psychological resilience, leaving him in an increasingly exhausted and psychologically depleted state. In this state, that developed even before his involvement in any of the events associated with this case, he was experiencing active symptoms of a posttraumatic stress disorder, as well as additional symptoms of anxiety, loneliness, and growing alienation. This combination of mental health difficulties produced growing levels of emotional numbness, and deteriorating levels of self-esteem." (p. 20);

- "I believe there is also significant evidence indicating Mr. Brown was never psychologically well suited to become a police officer. He appears to have grown up as a particularly sensitive and empathic individual, with a high need to help others, but also with more limited abilities to establish effective boundaries to protect himself from the intense pain and suffering he began to encounter in an increasingly regular manner." (p. 21);

- "Increasingly debilitated by his above noted mental health difficulties, and by his growing alienation that began to include growing feelings of inadequacy, and growing levels of irritability and bottled up anger, I believe he began to develop a growing reliance on Internet based pornography to experience a kind of escapist pleasure of the moment, so he could at least briefly forget about the kinds of thoughts and feelings that were increasingly eating away at him." (p. 21);

- "Given the totality of the evidence summarized above, I do not believe Mr. Brown suffers from any disorder of sexual deviancy, including pedophilia. (p. 22); and I believe the above summarized findings and conclusions represent very significant mitigating factors to be considered when pursuing efforts to arrive at a just sentence in this case. I am aware of the five year mandatory minimum associated with his current charge. I am also aware of the possibility that but for his being a police officer, the original opportunity he was given to break off any additional involvement with downloading [or uploading] child pornographic images might well have served as a sufficient warning to achieve that goal, in a manner that would have precluded his involvement in this case, but for his being a police officer. Given the distinct possibility that it was precisely this involvement - and the psychological harm it caused to him - that served as a major [and perhaps sole] factor in fueling this behavior, any further punishment would in effect represent an additional punishment for behavior fueled by harm incurred from an original effort to help others by becoming a police officer." (p. 22).

In short, because the defendant was a police officer who suffered from intense PTSD and was subjected to great public animus during the pandemic due to the international focus on police officer misconduct and racial injustice, the defendant – a good-hearted, kind, good-guy officer – plunged into a deep depression (like millions of others who slide into depression and boredom). According to Dr. Romanoff, he felt "dead" inside and turned to "porn" and "taboo porn, including CP" to try and feel something inside himself.  As Dr. Romanoff indicates, this explanation is not an excuse,

but a reason for how a law-abiding person can so err in judgment by dabbling in CP. This out-of-character misjudgment will truly haunt him for the remainder of his years. And unfortunately, Mr. Brown will now have to pay a steep price for such judgment errors.

### D. The Defendant Is a Man of Good Character and Has Lived a Life of Good Conduct.

The defendant will soon be 58 years old. Before resigning from LBPD, he was a police officer for almost 27 years. During that time, he had no disciplinary conduct and faithfully served and protected his community. He had never been arrested prior to the instant matter.[2] As stated in his letter to the Court, the defendant immediately and fully accepted responsibility for his bad conduct, thereby conserving prosecutorial and judicial resources. He recognizes the harm it has done to his wife and family. He is humiliated, but he has the intelligence and insight to understand what caused the offensive conduct and the strength of character to prevent it from ever being repeated. (See Exhibit B).

Many good character reference letters are attached stating that he is and has been a kind, caring and helpful person. (See Exhibit B). Other than this isolated matter, there is really nothing bad to say about the defendant.

### E. Service of a Prison Sentence Will Be Very Difficult and Stressful For The Defendant Because He Was a Police Officer and Because of the Type of Offense He Committed.

As explained in the attached Declaration of Jack Donson (See Exhibit C), a former BOP counselor and prison expert concerning the environment in prison and serving time

---

[2] Although the PSR states that the defendant has no prior convictions (PSR, p. 9 ¶ 41), nonetheless it states that he has "only one prior law enforcement contact/conviction in 2011." PSR, p. 18, ¶ 96. The latter is untrue, as was explained to the Probation Officer: Despite the defendant's previous efforts to have it removed, the DUI arrest some years ago of another person with the same common name, and who is of a different race, persists in being connected by the computers to the defendant's record.

in one, life for a prisoner who was a police officer will be exceedingly difficult because of being targeted by other inmates who do not like cops. This is common knowledge. The defendant will be in general population and will not be segregated into a "prison wing for cops." Compounding this is that the defendant is a sex offender, which, within the malleable and unique standards of morality in prison culture, marks the defendant for harassment, or even physical attack, by other prisoners. To endure this stress for five years is certainly punishing; adding an additional 10 months is unwarranted.

### F. The Defendant's Age and Health Problems Will Also Affect His Incarceration.

The defendant's 58 years and declining health are other valid considerations. As more detailed in the PSR (P. 11, ¶ 58), he has chronic skin pre-cancers requiring regular dermatological removal, two knee surgeries due to injuries suffered while on duty as a police officer, difficulty in walking without orthotics because of bone spurs in his heels, and takes medications for diabetes, hypertension, high cholesterol and heartburn, along with vitamins and minerals due to iron and vitamin deficiencies.

### G. The Recommended Fine of $25,000 is Excessive and Unjustified.

The PSR recommends assessment and immediate payment of a $25,000 fine. This is excessive and unjustified. The PSR indicates, but fails to fully consider, that while the defendant is incarcerated he will unable to contribute to the community expenses. Thus, his hope and intent is to leave his wife as much money as possible to cover basic expenses (home mortgage, car payment, utilities, *et al.*). His retirement is in jeopardy of being reduced by CALPERS because of the conviction. His wife's monthly unemployment benefit of $1,620 is not life long and it will terminate in August, 2022. Consequently, the PSR calculation of $7,685 monthly income must be reduced accordingly. The family residence is in a rural part of Kentucky, where the nearest town is Owensboro, 25 miles away with a population of only about 65,000. Her employment opportunities are therefore quite constrained by her lack of a skill, profession or trade, the limited number of

available jobs in a small town, as well as the minimal salary of any job she might obtain. Consequently, the small nest egg the defendant seeks to leave her hoping that she will be able to hang on while he is gone should not be severely diminished simply because at the moment he has the cash on hand to pay the recommenced fine of $25,000. Such a fine seems onerous given that the defendant will be also imprisoned for a lengthy time. The combination just seems to be piling on.

Indeed, the defendant's Financial Condition stated in the PSR (p. 14, ¶ 73) calculates the net worth of the defendant and his wife to be over $259,000, but $172,000 of which is the equity in their home. This equity is not liquid, and is only accessible if the home were refinanced, which would be highly unlikely given his felony conviction and their insufficient current assets to qualify for a new loan, let alone the ever increasing mortgage rates in our inflationary times resulting an even larger monthly mortgage. In actuality, the defendant is "house poor" and he and his wife face a daunting struggle to hold on while he is away for many years. A $25,000 fine will cause an extreme hardship on them over and beyond what they already face.

## H.   The Recommended Life Time Supervised Release is Unnecessary and Unjustified.

The defendant will be about 63 years old when placed on supervised released. As previously detailed, there is little to nothing about the defendant or his conduct that reasonably indicates he will be a recidivist or a risk to the community. Just the opposite is true. He has immediately and completely accepted responsibility for his conduct. He has an ever increasing knowledge and understanding of what caused it, and the determination and ability to assure the Court that it will never happen again. Because the defendant will be required to register as a sex offender for the rest of his life, lifetime supervised release is almost duplicative and unnecessary.  In a word, the defendant's conduct was truly aberrational. It will never be repeated and thus there is no need for lifetime supervised release.

## IV

## PRISON DESIGNATION

Based on the Declaration of Jack Donson, many good reasons exist for the Court to make a recommendation to the Bureaus of Prisons that the defendant be designated to FCI Englewood in Colorado, which if not available, then to FCI Petersburg in Virginia. If the Court is amenable to such recommendations, then the defendant requests that the commitment order state:

> "The court recommends the designation to any appropriate federal prison camp and apply the "Lesser Security" management variable based on his former capacity as a law enforcement officer and lack of a criminal history or institutional experience. If the BOP does not comply with camp placement, FCI Englewood, Colorado or alternately FCI Petersburg, Virginia. if Englewood is unavailable. If the BOP is unable to comply with this recommendation, the court requests a letter explaining the reason for the non-compliance."

## V

## CONCLUSION

Had this case remained in Superior Court rather than being handed-off to federal prosecutors, the defendant surely would have received a probationary sentence with appropriate counseling, sex offender classes, sex offender registration  and community service.  Instead, he now faces a five year mandatory minimum sentence.  Accordingly, it is respectfully requested that the Court accept the Probation Officer's recommendation of 60 months incarceration consistent with Section 3553 requirements that the Court "impose a sentence sufficient, but not greater than necessary," and assess a minimal fine, if any, and five years supervised release.

Dated: July 4, 2022                              Respectfully submitted,

/s/Howard R. Price

/s/Dana M. Cole

Attorneys for Defendant Brown

# EXHIBIT A

# EXHIBIT A

**Richard I. Romanoff, Ph.D.**
10780 Santa Monica Boulevard, Suite 460
Los Angeles, CA 90025
(O) 310-443-1570   (F) 310-443-1569
email: richard@romanoffphd.com

April 28, 2022

Mr. Howard R. Price, Esq.
9663 Santa Monica Boulevard, Suite 1250
Beverly Hills, CA 90210

Mr. Dana Cole, Esq.
1925 Century Park East, Suite 2000
Los Angeles, CA  90067

RE:        Anthony Mark Brown
Case No.:      2:21-CR-00447-FMO

Dear Mr. Price and Mr. Cole:

At your request I evaluated Mr. Anthony Brown at my above noted office on October 8, 2021 and via a Zoom teleconference on October 13, 2021; October 19, 2021; October 26, 2021; November 29, 2021; and January 31, 2022.  The purpose of this evaluation is to provide information about Mr. Brown's current and overall psychological functioning, with a particular focus on whether he suffers from a disorder of sexual deviancy or some other disorder that might predispose him to commit criminal sexual offenses. I was also asked to opine on his risk for sexual offense recidivism and current treatment needs.

As a licensed psychologist, I have conducted more than 2800 forensic psychological evaluations over the past 35 years.  I have conducted these evaluations in state and federal courts, and have been retained by defense attorneys and prosecutors, and appointed by judges. My evaluations regularly focus on efforts to assess competency, reconstruct mental states at the time of an offense, assess dangerousness, or recommend appropriate treatment plans for those deemed suitable for probation. I have been a member of the Los Angeles County Superior Court Panel of Psychologists and Psychiatrists for more than 30 years.  During that time I have conducted more than 500 evaluations of alleged and actual sex offenders pursuant to California Penal Code 288.1.  From 1997 through 2013 I was also a member of the California State Panel of Psychologists and Psychiatrists contracted to conduct evaluations of potential Sexually Violent Predators, pursuant to California Welfare and Institutions Code 6600 et. seq. I have conducted in excess of 350 evaluations of known sex offenders as a member of this panel.  I remain up-to-date with ongoing research in the area of sexual offense recidivism and assessment of dangerousness in connection with my evaluations of sex offenders.

Anthony Mark Brown                                              April 28, 2022
Case No. 2:21-CR-00447-FMO                                     Page 2 of 23

In addition to the patient interview, the following information was also considered as part of this evaluation:

1) Long Beach Police Department Arrest Report for Case No. 21-4691, initially dated January 29, 2021 (including supplementary reports).
2) United States District Court, Central District of California, Grand Jury Indictment, for Case No. 2:21-cr-00447-FMO, filed on September 21, 2021.
3) Pretrial Services Report, Central District of California, for Case No. 2:21-cr-00447-FMO, dated September 29, 2021.
4) Telephone interview with Ms. Kristin Brown, Mr. Brown's wife, conducted by Dr. Romanoff on December 20, 2021.
5) Zoom teleconference interview with Ms. Connie Pico, Mr. Brown's sister, conducted by Dr. Romanoff on December 13, 2021.
6) Telephone interview with Mr. Jonathan Doma, Mr. Brown's partner and friend, conducted by Dr. Romanoff on December 21, 2021.
7) Static-99R scored by Dr. Romanoff for Mr. Anthony Brown on February 10, 2022.
8) CPORT scored by Dr. Romanoff for Mr. Anthony Brown on February 10, 2022.

<u>Pertinent History</u>

Records indicate Mr. Brown's current federal case began with an investigation by the Computer Crimes Detail of the Long Beach Police Department, following their receipt of a Cyber Tip involving the uploading of three files containing Child Sexual Abuse Material. Tracing the source of the IP address used in connection with this activity led investigators to Mr. Brown, and to the eventual discovery of his use of a cell phone-based application, "MeWe," that was used to upload a total of eight images and one video of known Child Sexual Abuse Material [out of a total of "over 1,800 photographs" contained in his MeWe folders. The minors depicted in these images ranged from approximately "7 to 10" to "15 to 17" years of age. While most of these images depicted lone nude minor females, at times in a sexually provocative pose, two depicted prepubescent girls engaged in sexual activity with an adult male. One involved a "7 - 9" year old female with "her hand wrapped around the penis of what appears to be an adult male," and the other involved a "7 to 10" year old female "performing oral copulation on an adult male."

The above noted MeWe folders also contained multiple chat conversations held between Mr. Brown and other individuals using this application, that included several "graphic" sexual chats where Mr. Brown presented himself as "a thirty-eight-year-old female" [using the name of his wife], with a nineteen-year-old daughter, a thirteen-year-old daughter and an eight-year-old niece living with them. While these chat conversations include information from Mr. Brown's actual real world family, subsequent investigation efforts discovered considerable evidence of fabrication for essential elements of the life story he was telling, in a manner that makes clear the sexual activity he was describing in these chats were in fact fabricated. That said, the content of at least two scenarios summarized in the Long Beach Police Department arrest materials describe scenarios that I would characterize as stories involving imagined child sexual abuse.

Anthony Mark Brown                                               April 28, 2022
Case No. 2:21-CR-00447-FMO                                       Page 3 of 23

On May 27, 2020 Mr. Brown was contacted by one of the investigating officers, and was informed of the discovery of his involvement in the above noted activities. This officer "went on to explain to Anthony that this investigation would be closed, but if I received another complaint involving him, both cases would be presented for felony filing consideration." After hanging up, this officer realized he had failed to ask Mr. Brown for his date of birth, and upon using other Internet resources to search for this information, discovered Mr. Brown was an officer with the Long Beach Police Department.

This apparently led to the reactivation of the investigation, without any additional evidence of subsequent inappropriate behavior by Mr. Brown, and to his arrest on February 11, 2021 on State charges involving violation of California Penal Code 311.11 (A), possession of images depicting persons under the age of 18 engaged in or simulating sexual conduct.

Importantly, police spoke with Mr. Brown's wife, and with her then nineteen-year-old daughter [Mr. Brown's step-daughter], who were both referenced by name in the above noted sexual chats that depicted child sexual abuse. Both reported no involvement in or knowledge of any such activities with Mr. Brown, and both expressed their strong belief that it would be extremely out of character for the person they knew to ever engage in this type of behavior toward any minor. In particular, Mr. Brown's step-daughter indicated she has known Mr. Brown since she was eight, and while noting some history of conflict between them, indicated this conflict had nothing to do with inappropriate sexual activity, and they have since resolved their difficulties and were getting along well throughout the period of time associated with Mr. Brown's involvement in the events described above. Police also confiscated all of the digital devices owned and operated by Ms. Brown, and after searching these devices found no evidence of any inappropriate sexual material of any kind on them.

I also reviewed the United States District Court, Central District of California, June 2021 Grand Jury Indictment of Mr. Brown, filed on September 21, 2021. In this Indictment Mr. Brown is charged with three counts of 18 U.S.C. §§ 2252A (a) (2) (A), (b) (1), knowingly distributing child pornography and one count of 18 U.S.C. §§ 2252A (a) (5) (B), (b) (2), knowingly possessing at least one image of child pornography. These charges stem from the circumstances already summarized above. It is also important to note that the Pretrial Services Report for this case, dated September 29, 2021, indicates a 1996 arrest for Mr. Brown for driving under the influence of alcohol and for failure to appear, with a disposition indicating he was convicted of one misdemeanor count of driving under the influence of alcohol. During the current evaluation Mr. Brown indicated this listing is in error, and that he has established through available records that he is not the individual referenced in that arrest, who was a different Anthony Brown. Records indicate no other arrest history for him. I received no records documenting any history of substance abuse or mental health difficulties or treatment.

<u>Interview Information Obtained from Anthony Brown</u>

Mr. Brown is a fifty-seven-year-old man who was interviewed by me on six separate occasions for a total of approximately eleven hours. He was neatly and casually dressed, well groomed, and

made consistently good eye contact. He spoke in a clear and easy to understand fashion, reporting no history of hallucinatory experiences. I saw no evidence of any paranoid or delusional thinking. Answers to questions were consistently detailed, logical, and goal directed, reflecting an openness and curiosity about himself. Some answers reflected ongoing internal confusion over why he behaved as he did in this case. I did not get a sense he was consciously withholding information in an effort to avoid criminal responsibility. Rather, on these occasions, despite this confusion, he consistently acknowledged his involvement in his offense related behavior, expressed deep feelings of shame and remorse for this behavior, and concurrent feelings of anger and deep disappointment in himself.

Emotionally, Mr. Brown mostly came across as outgoing and socially engaging. He seemed to enjoy the process of reviewing his life history, though he also came across as someone who rarely engages in this type of effort. In a manner common for police officers, he often displayed an active avoidance of delving into feelings, especially his own. It was only when repeatedly pressed to share particular feelings that evidence of significant bottled up emotion, including avoided past trauma, began to emerge [that will be described in greater detail below]. Overwhelmingly these bottled up feelings were directly related to his work as a police officer. Interestingly, as is commonly seen when exploring battlefield related trauma in military personnel, he seemed to experience some sense of violating a kind of taboo by discussing this material outside the closed group of fellow police officers; as he simultaneously made clear that these feelings are also actively avoided when with fellow officers, for fear it violates a different taboo of showing any type of personal weakness. As Mr. Brown became increasingly able to share the collection of bottled up thoughts and feelings he overwhelmingly keeps hidden, evidence of more negative feelings also began to emerge, including feelings of heightened anxiety and depression, that had previously gone almost completely ignored. Mr. Brown reported no active suicidal ideation or intent. No formal cognitive testing was administered as part of the current evaluation, though his memory for recent and remote events and overall cognitive functioning appeared to be intact and at about average levels.

I began the evaluation by asking Mr. Brown some questions about his current life. At the start of our meetings, Mr. Brown was living in Lakewood, California, with his wife and other members of her family, at the home of his mother-in-law. By the end of our meetings he was living in Island, Kentucky, a more rural area about two hours from Nashville. Currently retired [as of February 11, 2021], as noted above, he was at the time of his arrest in this case working as a full-time police officer for the City of Long Beach, first as a reserve officer for about nine years, and then as a full-time officer for the next 27 years. Most recently, for the past 18 years, he was assigned to a position at the Long Beach Airport.

Mr. Brown reported receiving a series of death threats immediately following his arrest in this case after his home address was reported in the press. He said it was for this reason they left this residence and began living with his mother-in-law. Prior to the move to Kentucky, he reported becoming "a couch potato," spending as much as 30 hours a day watching TV, "to keep my mind off the case." He then enumerated multiple sources of ongoing stress, that soon left me with the clear impression of an individual overwhelmed by continuous stress, that becomes

Anthony Mark Brown                                                            April 28, 2022
Case No. 2:21-CR-00447-FMO                                                   Page 5 of 23

attached to whatever thought process is active in him at the moment. Mostly, this stress was focused on the negative impacts his activities have had on his immediate family, and on the physical safety of his family and himself.

Characterizing his overall life situation prior to his arrest in February 2021, he reported a lifestyle overwhelmingly focused on work, estimating he was typically spending 70 to 75 hours a week working, "including overtime." He described how during this time he was becoming increasingly disenchanted with work, "especially since George Floyd," explaining, "I didn't want to talk to people [referring to the general public], there was a lot of hatred being directed to me." He then explained, "I started [to work as a police officer] at 19, I was one year out of high school, and I took an oath to help people, but that was becoming impossible, so I was just wanting to call it quits." Other than work, he reported spending some time watching TV at home with his wife and "walking my dog." Discussing the year or two of time preceding his arrest he said the only other socializing he pursued was with "my buddies from work," explaining that by that time he had become almost completely unable to socialize with anyone else.

Reflecting a persistent tendency to assume others view him negatively, that seems to flow from long-standing feelings of low self-esteem, that have now grown to levels reflecting a degree of self-loathing; when asked to characterize his relationship with his wife he began to review a list of concerns he has, involving the negative impact his actions have had on her, that leave him feeling she is angry and deeply unhappy with him. [I spoke with Ms. Brown as part of the current evaluation, and saw no evidence of such feelings in her towards him. Information obtained from her will be summarized below.]

Discussing his current physical health, he reported undergoing gastric sleeve surgery in 2014, to aid in his efforts to lose weight noting, "I've always been a stress eater," as he then added, "I have Type II diabetes." He said he has now lost about 60 pounds [he is currently 200 pounds and 5'6" tall]. He is taking medication for high blood pressure and high cholesterol and reported a history of additional surgeries following a diagnosis of skin cancer in 2016. He reported being on a 60 percent work related disability, after a ruling that his above noted skin cancer; and additional orthopedic problems, including two knee surgeries, treatment for bone spurs, and treatment for a torn meniscus were work related. He also reported receiving a diagnosis of Sleep Apnea about two years ago, though he said he has difficulty using his CPAP machine and, "I wake up a lot, and then my brain turns on, and I can't fall back to sleep." Asked about a prominent facial scar he said it is from a "police car accident in 1991, my partner was driving, and I was a passenger, and we were going through an intersection, and we were hit by a 4 x 4, our lights and siren were on, we were heading to a call to assist, but we didn't see him and he didn't see us." He said while working his diet mostly consisted of "fast food," and still includes, "a lot of cake and cookies and sweets." he reported no difficulties with alcohol use at any time in his life, and reported no illicit drug use, including no marijuana use since his teenage years.

Shifting to a discussion of his mental health he initially indicated he is "fine." It was not until I began to press him to elaborate on prior statements he made as he was describing his current life difficulties, referencing ongoing  "stress," that he acknowledged long-standing difficulties with

Anthony Mark Brown                                                    April 28, 2022
Case No. 2:21-CR-00447-FMO                                          Page 6 of 23

"anxiety and fear," adding, "at times I have nightmares, I've seen a lot of dead people, murders and suicides," quickly adding, "it's probably all balled up inside there [pointing with his finger to his head]." He then reported the development of some feelings of anger explaining, "sometimes I'll yell at my wife," adding, "I guess it comes out at the wrong person." Crying for the first time in our session he then explained, "I think my feelings are all balled up inside." He then recalled crying after his father died in October 1985, but then being unable to cry following the death of his mother in December 2003. He then discussed the growing hostility he felt as a police officer, and his growing isolation from the general public that left him only feeling comfortable to talk to "fellow officers." At one point, after I characterize his job as nearly, if not completely impossible, he looked directly at me, and instantly becoming tearful said, "It was my whole life, law enforcement was my whole life, I worked as a reserve officer, I wasn't even paid," and then, "And I was forced to leave, so everything has been taken away from me."

Returned by me to a discussion of his current mental health he also reported having feelings of "extreme shame," explaining, "I don't even go into the credit union anymore, unless there is no other officer there," adding, "It's hard to hold my head up high." He also reported ongoing feelings of fear, because of the publicity his case received, and because of specific threats he received that leave him with an almost constant worry that "Kristin will get hurt, and it's my job as her husband to protect her, so now I feel it's better that we don't go out of the house [he made this statement before their move to Kentucky]. Importantly, Mr. Brown reported no suicidal ideation stating, "If I committed suicide, I'd only be hurting people I loved."

We then shifted to a discussion of the events associated with the current case. Beginning to cry he then explained, "I began using steroids around four years ago, I was feeling I wanted to be stronger, and look better," adding that he began feeling this way while working out at the gym with fellow officers who were "bigger and stronger." Describing this decision as "stupid," he then continued, "so I began using illegal anabolic steroids, I knew very little about them, I'd never used them before." He recalled taking these steroids and, "within about six weeks, I began feeling hypersexual and emotional, I was wanting to have sex, and I began thinking my wife was cheating on me, even though she wasn't, it was making me paranoid," as he then said, "and I began watching a lot of porn online."

After completing a 12 week cycle on these drugs, he said, "I became impotent, I couldn't maintain an erection, it does that," explaining this further elevated his anxiety at the time. Finally, he said he briefly resumed his use of steroids after going off them for about five weeks, and, "after a few more weeks, I stopped, and I threw everything away, but I still felt very sexual, and I was still viewing porn online."

Mr. Brown then explained, "In around 2019, I began using this website, "MeWe." He described how this website had "chat rooms for different categories," including for pornography. Initially, he described using these chat rooms to obtain adult pornography," and after a brief pause, "and then child porn," coming across in our session as ashamed as he reported this development.

Anthony Mark Brown                                                                            April 28, 2022
Case No. 2:21-CR-00447-FMO                                                                    Page 7 of 23

Asked by me to elaborate on his shift to viewing child pornography he described how some of the individuals in his chat room shared some of these types of images and, "I started looking at them, and then handing them off to the next guy." He then described involvement in "conversations" that came to include "talking sex," adding that initially these conversations focused on adult sexual fantasies, but then later on came to include "child stuff." He estimated involvement in these activities [referring to his viewing of child pornography and talking about child pornographic fantasies] for about a year, "and then I got arrested." Finally, he clarified, "Actually what happened was Long Beach police called me, and they said don't do it no more, and if I did, they'd prosecute me, but they didn't know I was a police officer," as he then continued to detail the subsequent events that eventually led to his arrest in February 2021 [consistent with the information contained in the arrest materials reviewed by me as summarized above]. He then closed by saying, "I think they decided to prosecute me because I was a police officer, and not a normal citizen."

Responding to some additional questions from me he said he first began viewing adult pornography as a teenager, acknowledging that he engaged in this activity for purposes of masturbation. He said his wife was aware of his periodic involvement in this activity and, "I think she didn't like it," and so he tried to pursue these activities on occasions when she was not around. Importantly, when specifically asked, he said that even before his use of the above noted steroids he was increasing his involvement in viewing adult oriented pornography, and increasing his involvement in masturbation.

Prior to his use of MeWe, he said he viewed "mainstream porn," obtained through free websites that included "pictures and videos." He reported viewing "heterosexual stuff, with some lesbian stuff too" for purposes of sexual arousal, reporting no sexual attraction to images involving force and no interest in viewing images or videos containing child pornography. Returning to a discussion of his involvement in chat rooms through MeWe, he described how "a long time ago, I did that with AOL, in the 1990s, for around two years," adding, "at times this included role-playing of sexual fantasies," as he then added, "that was before I was married." Pressed on why he thought he resumed this activity in 2019 he first said, "I have no idea," and then, "I guess I was horny." He then acknowledged using the names of his wife and her daughter, and including some actual details about them in his chats, as he also reported fabricating most of the details discussed by him. Discussing his use of some pictures of his stepdaughter, he said all of those images were of her clothed, with one image of her in a bikini, stating this action was "terrible and disgusting," "total idiocy," and "stupid, I have no excuse, I should have known better, but still I did it." At one point he described this activity as "self-destructive," adding, "I knew it at the time, but I still did it." He also described himself at one point as, "feeling like an entertainer, just telling these stupid stories." He said he was also aware that it was more serious to send child pornographic images than to receive them stating, "I have good morals, I had a really good upbringing, it's just that I threw them out the window."

Pressed again on why he thinks he might have behaved in a manner that was ultimately so self-destructive, he again expressed a deep sense of confusion about this question before saying, "I mean I don't want to go to prison, or lose Kristin, and I didn't want to hurt her, and I did hurt her

Anthony Mark Brown                                                    April 28, 2022
Case No. 2:21-CR-00447-FMO                                            Page 8 of 23

really bad, and that destroys me inside." He then said, "I think it has something to do with me becoming a more angry person [at the time]." Again pressed on his involvement in these activities despite him being a police officer he said, "I knew it was a violation of my oath, that's why I beat myself up every day, I knew everything about it was wrong, grotesque." Returning to his earlier statement he then said, "I think I've been disconnected from my feelings, I was harboring a lot of anger, and I knew what I was doing was wrong, but I was just becoming an extremely uncaring person."

Describing the pornography he was viewing at that time, both via the MeWe portal and other websites he was still using to viewing adult mainstream pornography, he estimated the adult images and videos constituted at least 90 percent of the total images and videos viewed by him. He also reported most of the child pornographic images viewed by him were of post-pubescent teenage girls, and only a very small number of the images were of prepubescent females. In this regard, he indicated experiencing some level of sexual arousal to the post-pubescent teenage girls [research indicates this pattern of sexual arousal is normative for adult males] and did not experience any sexual arousal to the prepubescent girls adding, "mostly I deleted those [prepubescent images], but sometimes I'd pass it on." Mr. Brown also indicated he never spoke directly to anyone who identified themselves as a minor, and never sought out contact with any minors, noting all of the individuals he communicated with presented themselves as adults.

Again pressed about why he thinks he crossed the line into viewing and forwarding child pornographic images he said, "I'm a very low-key personality, I'm not a Type A, I'm a Type C, and I joined [the police force] way too young, and I saw a lot of stuff, dead bodies, I was seeing that for nine years." He then explained the primary reason he asked to be transferred to the airport flowed from his growing need to extricate himself from involvement in cases that exposed him to these types of images. Describing his reaction to those experiences at the time he said, "I shouldn't have seen that kind of stuff, and it ruined a lot of relationships, because I couldn't care about people, even with my wife." He then described a pattern of change in him, that came to include a shift from him being an unusually "empathic" person, who genuinely enjoyed engaging with and helping others, to him becoming closed off from feelings in a way that left him feeling increasingly alienated, and "hating myself." Reflecting on this change he said he now believes his work as a police officer "changed me for the worse, it was a horrible job for me," before immediately adding, "But I don't want to blame anyone else, I became a cop, and then I became an asshole."

Asked for his understanding of the connection between this change in him, and the events associated with this case he then said, "I think it's connected, by that time I probably didn't give a shit, I'm not trying to make an excuse, I know I was not all there," immediately adding, "that's hard to admit, I know I need therapy, and in hindsight I wish I'd picked a different job, it ruined a lot of relationships with people," and then, "They tell you that at the start, that it will change you, and your relationships, and they tell you to prepare for it, but you can't, that's why you can only be with other officers, and I lost all my friends." Asked if he ever considered pursuing psychotherapy for the types of difficulties he was now discussing he said, "Finally they're realizing officers have PTSD just like in the military, and so there is more counseling, but if you

Anthony Mark Brown
Case No. 2:21-CR-00447-FMO

April 28, 2022
Page 9 of 23

go to see a psychologist, and the psychologist tells the Sargent, 'This guy's fucked up' they take you off active duty, and then you get made fun of, so you don't tell, you just bottle it up."

In an effort to place the above summarized events into a broader context, we then reviewed his earlier life history.  Mr. Brown was born in West Covina, and has lived almost his entire life in the Long Beach area of Los Angeles. He reported a close and loving relationship with both of his parents, who are now deceased. He has no full siblings.  His next closest half sibling, a sister, Connie Pico, is about 19 years older than him. [Ms. Pico was interviewed in connection with the current evaluation.] Mr. Brown also has an older half-brother [currently living in Needles, California], a deceased half-brother [who died from prostate cancer in his sixties], and a deceased half-sister [who died at the age of 77, around two years ago, from a collection of health problems].

Mr. Brown characterized his childhood years as, "very very good, I had great parents, I had a good upbringing, my parents were loving and supportive." Describing his mother he said, "She was very loving, and fun." He said she came from a large Italian family adding, "there was a lot of cooking and big family parties." He also described her as "protective," as he simultaneously noted, "but there were not a lot of rules." He described himself as a cooperative and well behaved child, who consistently avoided conflict, and who got along with most everyone. He said his mother remained at home until he was around 10, when she resumed work cleaning houses a few days a week. He said his mother did not suffer from any mental health difficulties, and though she occasionally drank a glass of wine or beer, had no substance abuse difficulties of any type. He also described her as, "a very happy Catholic, she attended church, that was important to her, she got that from her parents, and she stayed in that mold."

Shifting to his father he described him as, "very happy-go-lucky, he was easy-going, I only saw him get mad one time." He said his father was, "a union man," responsible for "tool and equipment maintenance," who worked for the California School Employees Association, and eventually went on to become a non-paid official in his union. Like his mother, he also described his father as, "outgoing and social," noting he got along well with his own family and had many friends.  He said his father was born in Kansas, grew up in Iowa, and came from "a railroad family." He said his father rarely talked about his childhood, and it is his understanding his father moved to California in the 1940s, when he was in his early twenties for "work opportunities." Mr. Brown reported no mental health or substance abuse difficulties for his father. He did report that towards the latter part of his life his father's health deteriorated, as he developed high blood pressure, diabetes, and back problems.  Then, over a period of about two months he experienced three separate heart attacks, that led to his death in 1985, when Mr. Brown was 21.

Mr. Brown reported an "excellent" relationship between his parents indicating, "they loved each other, they'd kiss and hold hands, you could see they loved each other." He said his mother never fully recovered following the death of her husband, and never remarried or dated. At one point reflecting on the lessons he learned from his parents he said, "They both went through the depression, and they both have that, and I learned a lot of things from them, and as a kid they put

me first, and we never had a lot of money, but we had food and clothing and shelter, and they always found a way to put me before them, like renting a trumpet for lessons even though we never went on vacations." Though he reported some regular interaction with his sister Connie during his growing up years [as already noted all his siblings are half-siblings, though he referred to each as sister or brother, and I will follow that convention for the remainder of this report], he overall described feeling like "an only child" during those years. Despite this he said, "I never felt lonely, there were a lot of kids in the neighborhood, and we all played together," quickly adding, "I had a great childhood, I couldn't have asked for anything better."

I view as important a recollection described by Mr. Brown at a subsequent point in our discussions, for a previously omitted memory from the time his mother died. Again noting that his mother died on "December 6, 2003," he recalled that in January [11 months earlier] she began to experience flu like symptoms and was prescribed antibiotics by her doctor. He said no further follow-up occurred until November of that year, when she was diagnosed with lung cancer. At that point his mother declined to pursue further treatment, and died about three weeks later. He then recalled noticing what he now considers to be a very important shift in himself, when he compares his reaction to his father's death to his reaction to his mother's death. He said, "I feel I still haven't grieved, I just went back to work, and at the time I wanted to tell her how good of a mother she was, but I never got to do that, I was just all wrapped up in my own little world, my own problems, I'd just started at the airport, and I was really stressed, and I'd just broke up with my fiancé." Asked by me why he thinks he never told his mother how much he loved and appreciated her as she was dying he said, "I don't know, it just didn't get done, and that sucks." Pausing to think a bit longer he then contrasted his reaction to his father's death to his mother's death and said, "back then [referring to his father's death] I was more sympathetic, I was only 21, and I was just starting in law enforcement, but growing up, I was closer to my mother than my father, I was always closer to her, but by the time she died I was more numb, and that began showing up in all of my relationships."

Shifting to Mr. Brown's academic history, he said he attended public school from kindergarten through his high school graduation in 1983. He reported consistently average performance throughout these school years, little conflict with teachers or other authority figures, and no formal disciplinary history. He reported no social difficulties at any point in his schooling, noting he consistently had good friends maintained over time. He reported an initial interest in high school to become a firefighter, but changed his mind in his Senior year to become a police officer.

Unable to enter the Police Academy until turning 21, following his high school graduation he enrolled in Long Beach City College, but left to enter the Reserve Police Academy after turning 19. Discussing his experiences at that time he said, "I knew a lot about what to expect, but then I saw it was different when you really do it, it was eye-opening, like being yelled at, like being in the military, and I started getting more nervous and stressed." Continuing on despite these difficulties he said, "But I learned not to let it bother me, and I never considered quitting." Finally, in 1994 he was accepted into the Police Academy, and in September 1994 he became a full-time paid police officer, and continued in this role until his retirement in February 2021.

Asked to describe how his life began to change as he became a police officer he said, "I became two different people, as a person I was more mellow, but as a police officer I had to be more forceful and bossy, your job is to enforce rules and order, and not to be someone's friend." He also discussed some dramatic changes that occurred in the nature of his police work from when he first began. At first he said, "Guns were not as prevalent, like maybe there was one call per week with a gun, but then it became every day you'd get calls like that," leading to a significant change in the level of stress and anxiety he began to experience in connection with his work. Noting that the training he received emphasized the importance of treating the people he encountered with respect and courtesy, he said during the 27 years he served as a full-time police officer he only received three writeups, all for minor technical violations, with none involving "any use of force issues," and none involving any "formal reprimands."

We also discussed in some detail his experiences over the years as a police officer. Mr. Brown reported never becoming fully comfortable or confident as a police officer. He differentiated between a certain type of officer that he referred to as a "Type A" officer, that was more aggressive and more oriented towards seeking the limelight, indicating these were the officers who regularly received the most prestigious assignments, and the ones who were treated with the most deference by their superiors. In contrast, he referred to another group that he labeled "Type C" officers, including himself in this group. He described this group as more oriented towards getting the job done day by day, in a more low-key fashion, without efforts to seek the limelight, and with more concern to avoid unnecessary or provocative actions that might lead to otherwise avoidable risk. He also made clear that within the force as a whole, Type A officers regularly looked down on Type C officers in a manner that added to his discomfort and feelings of insecurity.

In October 2002 he requested placement at the Long Beach Airport stating, "I liked that it was safe and less stressful." However, he also described a growing level of disrespect he began to experience in the way he was treated by the general public at the airport, stemming from his role as an enforcer of rules and regulations they disliked.  He also described how a growing collection of work related physical disabilities began to further wear away at him.  And then, as already discussed above, as the general level of frustration and anger towards police began to increase, even before the death of George Floyd, he became increasingly oriented toward plans for retirement, and during the last few years of his work as a police officer, increasingly preoccupied with the arrangements he began to develop in pursuit of that goal.

Illustrating his pattern of avoiding any more detailed elaboration for past traumatic experiences periodically briefly referenced by him, it was not until specifically asked about them that he slowly began to discuss this aspect of his past work history. He began by explaining, "As a police officer you see a lot of bad things," before adding, "and some of that stuff is still with me, like mainly the dead people, and you feel weird." Continuing on he said, "I still see those things, like an elderly lady who jumped off a tall building, and on impact her head hit, and got disconnected from her body, and back in the day, there was no cleanup service, and the fire department would hose it into the drainage ditch, and they'd joke about it," finally stating, "I still see that picture of her on the ground decapitated." He recalled another incident where, "There

Anthony Mark Brown                                                    April 28, 2022
Case No. 2:21-CR-00447-FMO                                           Page 12 of 23

was this older lady, and I had to kick the door in, but it took an hour to get permission, and I felt
that if I had gotten in there faster I could have saved her, but she shot herself in the bedroom
with a shotgun." He then said, "and then there were the murders." Though he reported exposure
to a much larger number of actual incidents of this type, he said at this time, "There are mainly
five or six that keep coming back, they just come up out of the blue, and it hits you." He said
immediately after a particular incident he would experience these types of flashbacks "three or
four times a week," as he then said, "but it becomes less and less over time, and now it's down to
like once every couple of weeks."

Asked why he never went to see a therapist to discuss what even he obviously saw as evidence
of a post traumatic reaction he said, "That's my fault," adding, "I probably should have gone to
see someone," and, "The department had a psychologist, but no one went, everyone felt they'd
go to management, and then you'd be taken off patrol, and put at the front desk, and then
everyone would know you're having problems."

Discussing the DUI arrest listed on his record, he clarified how this listing is in error explaining,
"My fingerprints were mixed up with someone else's," and, "that person is a male black, and
clearly not me, but it was a snafu with the records."

We then reviewed his past relationship history. He reported involvement in four more serious
dating relationships and a small number of casual dating relationships. He said his first more
serious relationship began when he was 29, with a woman who was "25 or 26." Noting her
brother was also serving as a reserve police officer, he said they became friends first, for about
two years, before they began dating, and dated for about two additional years. Asked to describe
this woman he said, "She was very nice, kind, loving and caring." Indicating they consistently
got along well with each other, he said she also had a son who was around six, and at the time he
viewed his presence as a negative, in a manner that led to their eventual breakup. Noting they
kept up after ending their relationship, he said this woman eventually married, and they remain
friends through the current time.

Mr. Brown's next serious dating relationship began when he was around 35, with a woman
attending graduate school to become a clinical psychologist. He said they got along well, became
engaged to marry, "but then I ended up getting cold feet, I don't know why." Interestingly, he
said one of this woman's brothers was in law enforcement, and though remaining confused about
why he developed "cold feet" at the time went on to say, "I still think she would have been a
great person to live with for the rest of my life."

His next relationship began when he was 39, soon after his mother passed away. As with
previous partners, he described this woman as "kind, loving and caring," but also as more social
and outgoing than his previous dating partner. He said they remained together for about 18
months, and at one point lived together. Discussing the reasons for their breakup he said, "I
caught her lying," indicating he discovered she was actively smoking marijuana after she had
assured him she was not. He said they also remained on friendly terms after breaking up, and he
subsequently learned she married an attorney and moved to Texas.

Anthony Mark Brown                                                      April 28, 2022
Case No. 2:21-CR-00447-FMO                                             Page 13 of 23

Finally, he said his next serious dating relationship was with his current wife, Kristin. They met at Long Beach Airport, indicating at the time she was working as a TSA agent.  He described her as "very loving and caring, she keeps me in line," before adding, "but she's not bossy, she just calls me on my bullshit." He also described her as "smart." He said they dated for about two years before marrying on February 11, 2012, and described a consistently good relationship between them through the current time, before again noting that he believes his recent actions have hurt her badly, and though she remains loving and supportive towards him, he feels an ongoing need to do better in his relationship with her in order to "make it up to her."

Mr. Brown said he has never "cheated" on any woman while involved with her. He also indicated the sexual relationships he has had with each of his serious dating partners, including with his wife, have been mutually enjoyable and mutually satisfying, and were never an area of tension or difficulty within the relationship. He did report occasionally resorting to additional masturbation activities while with each of these women to supplement the sexual contact they had, though he said he always preferred engaging in sexual activity with his partners rather than in masturbation.

He said he first began masturbating when he was around 15 or 16 indicating, "I'd think about naked girls in my head, from movies I saw, like Animal House." During his late teenage and early adult years he began masturbating to images in mainstream magazines such as Playboy, but never subscribed to any of these magazines. He first began using the Internet to view pornography in around 2000, and as already noted above, said this viewing involved his use of mainstream free pornographic sites available on the Internet, and never included any viewing of child pornography, until the events associated with this case [as already summarized above]. He said he was never a victim of any unwanted sexual contact.

As we were concluding our discussions, I again raised my opinion that above summarized information indicated a more active need for meaningful mental health treatment for Mr. Brown at this time. At that point he indicated that following his arrest he did meet with a psychologist [via video-conference] for 14 sessions, but did not find it particularly helpful, at one point noting the psychologist would sometimes "doze off." This final conversation occurred while he was already in Kentucky, and in response to my statements he said, "I know I need help, and I'm open to treatment," before adding, "and I've been meeting with a local therapist, I've seen him three times, but he can only see me once a month right now, because he's so busy, but we're trying to meet more regularly." He said his therapist is aware of his current court case, including his involvement in viewing and uploading child pornographic images. We then discussed in some detail my recommendations for the issues I view as central to his treatment [to be discussed in the final section of this report], that he agreed to include in his ongoing work moving forward.

<u>Interviews with Other Collateral Sources</u>

In addition to Mr. Brown, I also spoke with his wife, Ms. Kristin Brown; his sister, Connie Pico; and his partner in the Long Beach Police Department [for the past 18 years], Mr. Jonathan Doma

Anthony Mark Brown                                                                          April 28, 2022
Case No. 2:21-CR-00447-FMO                                                                  Page 14 of 23

for purposes of the current evaluation.  For the sake of brevity I will only summarize below
information deemed relevant by me to the current evaluation.

I spoke with Ms. Kristin Brown for just over an hour on December 20, 2021. She said she first
met her future husband in 2001, while working as a TSA agent at the Long Beach Airport. She
described no significant relationship between them during that time indicating, "It was more of a
hi, bye type thing," before indicating they began dating soon after she left the airport to begin
working for the City of Long Beach, in their parking enforcement division in March 2009, and
married in February 2012. Asked for an overall description of her husband she said, "He's
wonderful, he does things for you, without you asking," adding, "He thinks of others before
himself." She also described him as "talkative," and as "a homebody, he doesn't party or drink,
but he loves to talk." Asked to characterize his strengths she said, "If he starts a project he
finishes it, he doesn't do anything half-assed, he's very detailed in his work." Asked to
characterize his weaknesses she laughed and said, "He talks too much sometimes." She then
added, "And he goes overboard with worrying, he worries a lot, especially about me."
Specifically asked, she said she has never seen evidence of difficulties with alcohol or any other
substance abuse, and when asked if she thinks he suffers from any mental health difficulties said,
"No, nothing at all."

However, when asked if she saw any evidence of him seeming "hurt or frustrated" she
immediately responded, "Yes absolutely," adding, "he got tired of hearing everyone being anti-
police all the time, that was his career, and then everyone was seeing him as scum, that's a
problem." Noting that she also worked in "the field," she said, "We'd talk about that, we both
were dealing with naughty people, and he'd vent," and, "He stopped telling people what he did
for a living, so did I, we'd just say we work for the City." Again asked if this aspect of his life
was taking a toll on him she said, "It was, it was heartbreaking for him, you're doing everything
to help people, and the people you're helping are just getting so angry, and they record you, and
they assume the police are always after you, even though you're the one that was drinking and
driving." Reflecting the tendency of police officers to view this as part of the way things are she
then said, "I'd say he was stressed, but we were all stressed, and I didn't see that as a problem,
for us it was just that life's not perfect."

Discussing their sexual relationship she began by describing it as "normal" and "comfortable."
She indicated that at the start of their relationship they engaged in sexual contact on an almost
daily basis, and continued in that fashion for the first few years before "things began to taper off,
I was going through a lot with my daughter, she's 20 now, but she was hanging out with the
wrong people, and she was getting in trouble, and me and Tony were on the same page, and we
both felt she wasn't doing well, but we finally worked through that." Describing the nature of
their sexual relationship over the past few years she said, "It varied, sometimes it would be a few
times a week, and sometimes it was nothing for a week or two," quickly adding, "If I'm on my
period, it's leave me alone." Overall she described the relationship as mutually satisfying, and
described her husband as, "a considerate lover."

Anthony Mark Brown                                                    April 28, 2022
Case No. 2:21-CR-00447-FMO                                          Page 15 of 23

Asked for her thoughts about her husband's involvement in the activities associated with his case she began with the moment when, "I was at work, and these two detectives came to see me." She said at first she thought they were joking, and it took her a while to understand they were serious.  After being told by them her husband was being investigated for activities involving child pornography, she then turned to me and said, "I told them, 'You got to be kidding me, that's not Anthony,'" and then beginning to cry said, "That's not who he is, no way." Asked how she could be so sure of this she said, "I have a daughter, and nothing like that ever came up, and we were happy together, and we'd just gotten back from a vacation to Hawaii, we had a great time." Again pressed on this subject she said, "He's known my daughter since she was seven or eight, and he loved her," before adding that even though her daughter is now upset with him because of his involvement in this case, she has reassured her he never engaged in any inappropriate sexual activity toward her at any time. She also said, "We'd go to friends' birthday parties, and he never sought out kids, I've never seen him seek out kids, ever."

Specifically asked if she was aware of his use of the Internet for viewing pornography she said she was explaining, "When we first began dating, I'd see it in the user history, and I asked him why are you doing this, but it was all regular porn, and I told him you could at least exit out from it," noting that after she made this request she saw no further evidence of his involvement in this activity, and this topic did not come up again until his arrest in this case.

Asked what she thinks her husband needs at this time she said, "Definitely counseling, he needs to continue with the counseling." Then, again beginning to cry she said, "and I definitely think he doesn't need jail," adding, "I have a daughter, and I don't want people out there doing these things, but I don't think Tony needs jail, he just needs counseling, he needs to figure out why, he was never in trouble in his life, he just made a stupid mistake, he's a good person."

On December 13, 2021 I spoke for an hour with his sister, Ms. Connie Pico. She began by explaining that she is about 19 years older than her brother and moved out of her parents' house when he was only six months old.  She also explained how after moving out she continued to visit him at the house most every weekend "until he was 21 or 22," and even then continued to see him frequently through the current time concluding, "We've always been close, and we're still close."

Overall, she described her brother as, "caring, loving and compassionate." Asked to characterize his strengths she said nothing in addition to the above noted description comes to mind. When asked to describe his weaknesses she then said, "Self-confidence, he's always second-guessing himself, even when he was a kid." She does not know why this is the case. She described her mother, father, and the home environment as her brother was growing up in a manner that was extremely consistent with the account provided by Mr. Brown as already summarized above. Noting that she moved in with her mother following the death of Mr. Brown's father, she then stressed how he became "especially helpful" to their mother at that time stating, "He'd make sure that everything was working at the house, he cared for her, he stayed with her the whole time when she was on hospice, for around seven or eight days." Specifically asked to describe what her brother was like socially during his growing up years she said, "All the neighborhood

Anthony Mark Brown                                                    April 28, 2022
Case No. 2:21-CR-00447-FMO                                          Page 16 of 23

kids used to come over and hang out, and Tony was never shy, they all played together, there was no fighting." She then added, "and he volunteered with the animal shelter, there were always a lot of strays at our house, and Tony always had strong feelings for animals, and for people, he was someone who needed to help, and he's still like that to this day."

Discussing her brother's involvement in dating relationships she said, "He'd date girls for quite a while, there were no one night stands, that's not him, and I met several of them, I think four of them, they were all very nice, very sweet." Discussing his current wife Kristin she said, "She's very sweet and loving to Tony, and she's always been nice to me." Overall she described the relationship between them as, "very loving, I think there was some conflicts with the stepdaughter, she was eleven when they got married, she didn't like being scolded by Tony," before adding that it is her understanding they eventually worked out these issues, and developed a better relationship with each other as his wife's daughter got older.

Asked if she ever saw her brother around young girls or boys she said, "There were nieces and nephews, and they always got along good [referring to her brother's relationship with them]," adding, "He was like an uncle, and they all felt comfortable, they all loved him, they still do." Specifically asked, she said to her knowledge none have ever said anything to anyone about experiencing uncomfortable moments with him for any reason.

Shifting to a discussion of the events associated with the current case she said she only learned about the case after repeatedly calling her brother shortly after his arrest without receiving any response, in a manner that left her feeling increasingly concerned. She recalled that at the time her brother and Kristin had just returned from Hawaii, and she was calling to wish them a happy anniversary, but her calls were not being returned. Finally she said, "I called, and I said what's up, and he [referring to her brother] broke down, and he said he was arrested, and he was crying, and I could hardly understand him, and I just heard something about child pornography." She said she subsequently learned more from information she read in newspapers and said, "I was stunned, I had no idea where any of that came from, that's not him." Asked to elaborate on this she said, "I've seen him around kids, and I can't fathom him doing anything like that," adding, "He was never a touchy-feely person with kids, or anything else like that."

Asked if she was aware of any other problems her brother was having in his life prior to his arrest she said she was not. Asked how he felt about being a police officer she said, "He never talked about that, positive or negative," adding she always assumed he felt positively about his work, before again adding that he never talked to her about that part of his life.

Asked if there was anything else she wanted to say before we ended she then said, "I love him, and I worry for him, and I hope for all the good he's done in his life [pause], I just wish if this is true, if there's a problem that caused this, to let it be corrected, and that for all the good he did in the police department, that all of that will be taken into consideration."

Finally I spoke with Mr. Brown's partner from work, Mr. Jonathan Doma on December 21, 2021, for an hour. Mr. Doma said he first met Mr. Brown in 2003, when both began working

Anthony Mark Brown                                                    April 28, 2022
Case No. 2:21-CR-00447-FMO                                           Page 17 of 23

"the airport detail," adding, "We were on the same shift, we bonded, I'd say we became close, almost best friends."

Describing Mr. Brown over the years he began by saying, "His personality has been very consistent," and then, "He's friendly, caring and concerned for others." He also described him as "sensitive, he worries about other people's well-being, he always wants to lend a hand to people who need help." He said this included family members, friends, and at times even members of the public he met through his work activities. Specifically asked, he reported seeing no evidence of mental health or substance abuse difficulties.

Once again, as was the case with Mr. Brown's wife, it was not until specifically asked concrete questions that Mr. Doma began to provide information indicating significant sources of stress and distress Mr. Brown has been feeling for many years. For example, asked by me if he felt hated by members of the public, without pausing he immediately said, "We all feel that, and we talked about that all the time, how the community has changed, how we're just trying to do the right thing, but there's this lack of appreciation, we both felt the same way." He then said, "I think Tony felt beaten up, exhausted," as he then added, "that he didn't show it much, but we talked about it, that the whole world was changing." Finally, he said, "We'd talk about retiring, to get away from people, Tony wanted to get a farm, and live a quiet simple life, he'd been talking about retiring this year or next."

Asked if he saw any evidence of Mr. Brown changing in how he handled his work over the years he said, "Both of us did, we didn't like dealing with people, we tried not to communicate with people outside the force," though he also indicated that Mr. Brown consistently got along with fellow officers and supervisors at work, before reiterating his overall observation that he never saw any evidence of "anything wrong," or of Mr. Brown being "unhappy." He then spontaneously contrasted the way he felt Mr. Brown was coping with things [that he saw as normal for police officers, and evidence of there being nothing wrong] with a different officer who also worked at the airport, who committed suicide in 2014. Referring to that person he said, "You could see he was feeling the hostility, and we all felt he needed help, and Tony knew him, we all knew him, he was on our team." Later on in the interview, Mr. Doma reported feeling concerned about Mr. Brown following his arrest in this case, worried he might "kill himself," but said that more recently, he has become increasingly certain that, "He's holding up, and I think he's coping okay, at least as best as he can, and I don't think he'll do anything like that."

Discussing the relationship between Mr. Brown and his wife Kristin he said he knew Ms. Brown before she and Mr. Brown began dating, when she was still working as a TSA agent at the airport. He described her as "quiet," and as someone who, "likes things the way she likes things." Discussing the relationship between them he said, "They loved each other," before adding, "Tony always liked to talk things out, and they were always able to work things out."

Shifting to a discussion of the events associated with the case he said he first learned about it on the day of Mr. Brown's arrest. He said he was shocked at that point and then added, "and I'm still shocked, it makes no sense, no sense." Asked why he thinks it makes no sense he said,

Anthony Mark Brown                                                             April 28, 2022
Case No. 2:21-CR-00447-FMO                                                    Page 18 of 23

"because of his demeanor," adding that in all the years they spent together he never heard or saw anything to indicate Mr. Brown was viewing child pornography, or had any sexual interest in minors or any "sexual perversion."

Asked what he thinks Mr. Brown needs at this time he said, "I think he needs someone to talk to, to walk him through all this, all the stress, and I don't know much about the case, and we don't talk about it, and I'm just trying to be a good friend, and just to talk, and we talk about other things, but not the case." He then again reiterated his belief that he views Mr. Brown as both a good friend and a good person, and not as someone who represents a danger to the community in general, or to children in particular.

Test Results

In an effort to compute Mr. Brown's risk for future sexual offense recidivism, I computed his score on the Static 99R (Hanson and Thornton, 1999; Helmus, 2009). The Static 99R is a carefully developed research instrument that has identified important variables that significantly correlate with sexual recidivism risk. This scale has been found to have moderate predictive validity. This scale replaces the Static 99 scale, as newly published research (Helmus, 2009) has found this scale superior to its older version, based on the more comprehensive adjustment for age at release relative to the Static 99 scale. The test developers have now recommended the use of this newer version to replace the older Static 99. Static 99R variables yield a total score that can be linked to specific estimates of sexual recidivism risk. These estimates were derived from a large number of studies examining sexual recidivism risk (combined sample N = 8,139) conducted in Canada, the United States, the United Kingdom, Western Europe and New Zealand. It is important to note that absolute recidivism risk varies from study to study. One of the most important factors affecting this variability is the average likelihood of recidivism for any particular sample. Specifically, groups of individuals selected from samples with lower risk (overall lower base rates) have lower absolute recidivism risk levels at any given Static 99R score. In contrast, individuals selected from samples with higher risk levels (overall higher base rates) have higher absolute recidivism risk levels at any given Static 99R score. Different norms have now been developed in an effort to account for these differences in base rates for recidivism. The norms used below were taken from the most recent norms for this instrument, published by Dr. Phenix, Dr. Helmus, and Dr. Hanson on January 1, 2015.

One set of tables was developed for individuals labeled as "Routine." This group is comprised of all screened sex offenders from the combined studies used in the development of the Static99R. This sample is most appropriate when little else is known about the offender or when there is no special or unusual degree of pre-screened dangerousness, based on all factors know to effect recidivism risk. It is most representative of the general population of adjudicated sex offenders. After reviewing the circumstances in this case, I believe this is the most appropriate category for Mr. Brown. I will therefore use these norms for purposes of the current clinical evaluation.

Anthony Mark Brown                                                    April 28, 2022
Case No. 2:21-CR-00447-FMO                                           Page 19 of 23

Mr. Brown obtained a Static 99R score of 0 (-1 for young; 0 for single; 0 for index nonsexual violence; 0 for prior nonsexual violence; 0 for prior sex offenses; 0 for prior sentencing dates; 1 for any convictions for noncontact sex offenses; 0 for any unrelated victims; 0 for any stranger victims; and 0 for any male victims).   There is a ninety-five percent chance that his actual recidivism risk level is between 2.2% and 3.5 percent over a five-year period of time.  This score would place him in the lowest risk category for committing a future sexual offense as computed by the Static-99R.

I also calculated Mr. Brown's score on the Child Pornography Offender Risk Tool [CPORT], a relatively new instrument that is not nearly as well researched or validated as the above scored Static-99R.   It is critical to begin with specific statements made by the developers of this instrument [Seto & Elk (2015), pg. 427] who state, "This tool was not predictive for offenders only known to have child pornography offenses, which we attribute to the low base rate of sexual recidivism in this subgroup." This statement specifically indicates that at the current time, the CPORT is not predictive for purposes of estimating future risk for offenders whose only offense involved a child pornography offense [as is the case with Mr. Brown]. Seto and Elk attribute this lack of predictive ability to the fact that as of the current time, there remains only one study conducted on this instrument, that consisted of 266 adult male child pornography offenders followed for a period of five years.  They further attributed this lack of predictive ability to the low likelihood that any individual offender in this group actually re-offended during that time [i.e. low base rate].

The authors of this instrument also concluded that, "though more work is needed to cross validate risk factors identified in this research and to examine other risk factor candidates not included in the current study, we believe the CPORT can be useful in the structured risk assessment of adult male child pornography offenders as a preferable alternative to unstructured risk judgments," and, "we expect that other established sex offender risk measures, such as the Static-99R, would also perform in a sensible way with child pornography offenders." (Ibid, pg.427).   In effect, they conclude that at this time results support the use of this instrument as **only** one factor to be considered in connection with overall risk assessment efforts, along with other recidivism risk tools [such as the Static-99R], and other relevant factors. Elk & Seto [2016, pg. 5] also state, "at this time, CPORT may be useful for ranking offenders according to risk score (rather than using probabilistic estimates)." By this, they mean at this time, no specific recidivism risk estimate can be generated for any specific offender, though the score can be used to assist in making determinations of who the riskiest offenders are within a known group of child pornography offenders.

Given the current limited level of research based evidence available for this instrument at this time, I believe the above summarized information about it needs to be kept in mind when attempting to understand the potential benefits and potential harms that can flow from excessive and unwarranted emphasis on the results generated by this instrument in isolation. Having said this, and in keeping with all of the above noted qualifications, Mr. Brown obtained a score of 0 on the CPORT out of a total possible score of 7 [Range 0-7].  This is the **lowest** possible score one can obtain on this instrument, and in keeping with the above stated qualifications, would

Anthony Mark Brown                                                         April 28, 2022
Case No. 2:21-CR-00447-FMO                                                 Page 20 of 23

indicate that Mr. Brown should be viewed as being in the lowest risk group of individuals who
have been convicted of a child pornography offense in relation to the total population of adult
males who have been convicted of one or more child pornography offenses.

Summary and Conclusions

Above summarized records, interviews and test results provide considerable information about
Mr. Brown's current and overall psychological functioning. Specifically, there is no evidence to
indicate any pattern of mental health or substance abuse difficulties for him prior to his
becoming a police officer. There is evidence to indicate that over the course of the 36 years he
spent working as a reserve police officer, [nine years] and a full-time police officer [27 years] he
experienced a variety of traumatic experiences, and was also subjected to an additional
collection of work related stressors that began to eat away at his previously higher level of
psychological resilience, leaving him in an increasingly exhausted and psychologically depleted
state. In this state, that developed even before his involvement in any of the events associated
with this case, he was experiencing active symptoms of a posttraumatic stress disorder, as well
as additional symptoms of anxiety, loneliness, and growing alienation. This combination of
mental health difficulties produced growing levels of emotional numbness, and deteriorating
levels of self-esteem.

Of even greater importance for purposes of the current evaluation, current assessment results
strongly indicate an absence of evidence of pedophilic tendencies or of any other pattern of
sexual deviancy in Mr. Brown prior to his involvement in the events associated with this case in
2019, when he was already over 55 years of age.

Focusing in on his mental state in the period of time associated with his offense related behavior,
I believe he was experiencing levels of growing alienation and depression that left him
increasingly unable to maintain healthy interpersonal relationships, especially ones requiring
access to feelings of love and empathy. I view this as a direct consequence of his unrecognized
and untreated active posttraumatic stress disorder. It is likely that additional peer pressures
associated with his work as a police officer also directly contributed to the pressures he
experienced to avoid recognition of these difficulties, or to obtain treatment for them.
Additionally, dramatic social changes unfolding over the course of his career as a police officer
fundamentally shifted the level of stress and pressure he began to experience because of a
dramatic reduction in the level of respect and appreciation that previously flowed to police
officers in that role, coupled with a dramatic increase in the level of hostility and contempt being
expressed directly by members of the general public towards police officers in that role.

I believe there is also significant evidence indicating Mr. Brown was never psychologically well-
suited to become a police officer. He appears to have grown up as a particularly sensitive and
empathic individual, with a high need to help others, but also with more limited abilities to
establish effective boundaries to protect himself from the intense pain and suffering he began to
encounter in an increasingly regular manner. I believe this left him at much higher risk for being
psychologically harmed by the challenges of his particular job and at higher risk for developing a

posttraumatic stress disorder. It also likely left him feeling more alienated from at least some of his fellow officers [who he referred to as Type A officers], who possessed better defenses for managing the particular challenges of being a police officer, in a manner that left him feeling increasingly inadequate and weak relative to them.

Focusing in on the events associated with this case, there is evidence to indicate Mr. Brown has always had a somewhat higher than average level of what I would characterize as normal sexual desire. This contributed to a desire to engage in sexual relations and additional masturbation activities at higher than average levels. I want to emphasize the absence of evidence that this heightened sexual desire was in any way attached to any co-occurring sexual deviancy, including any sexual attraction to underage females [or males]. I do believe it contributed to some increased pressure to supplement his monogamous sexual relationships with additional episodes of masturbation that began to utilize Internet-based pornographic materials that rapidly became easily available to him with the advent of the World Wide Web. I see no evidence to indicate he was using anything other than mainstream pornographic images for these purposes prior to 2019.

Increasingly debilitated by his above noted mental health difficulties, and by his growing alienation that began to include growing feelings of inadequacy, and growing levels of irritability and bottled up anger, I believe he began to develop a growing reliance on Internet-based pornography to experience a kind of escapist pleasure of the moment, so he could at least briefly forget about the kinds of thoughts and feelings that were increasingly eating away at him. I do not have any clear explanation for why this escapist use of masturbation began to include some growing involvement with child pornographic images, though I want to note two important things about Mr. Brown's activities in this case when considered in relation to the hundreds of child sexual offenders I have evaluated over the years: 1) The materials found in Mr. Brown's possession would be considered by me to be on the much milder side when considered in the context of the kinds of images that are often found in the possession of pedophiles or individuals with other types of actual sexual perversion and: 2) The child pornographic images that were found constituted a much smaller percentage of the total pornographic images present, than for a typical pedophile or individual with some other type of actual sexual perversion.

I am also struck by what I found to be genuine feelings of disgust and shame in Mr. Brown as he pursued this involvement in a manner that both he and I came to view as evidence of something self-destructive going on inside of him, that he was unable to stop or control even though he knew he was behaving in a disgusting and shameful manner. I also view his decision to use the names of his wife and stepdaughter, and to send some images of his stepdaughter [though current evidence indicates none of these images were pornographic in nature] as making more sense when thought of as a self-destructive act that risked his rejection by them in a manner that would have left him even more isolated than he already was [i.e successfully self-destructive] .

At one point in our discussions, as he began to acknowledge the presence of mental health difficulties in himself stemming from his work as a police officer, he made reference to fellow officers encountered by him.  He discussed how these officers often developed serious drinking problems, or other serious life difficulties, that he could now see as a consequence of the harm

being done to them by the accumulating trauma of their work.  He then gave himself a compliment, stating that at least he had not deteriorated in *that* manner. I cannot help but think that the events associated with this case are at least in part a manifestation of the type of self-destructive behavior that can take so many different forms in the lives of long-term police officers who must struggle to manage the nearly [or perhaps completely] impossible challenges of their chosen career.

Given the totality of the evidence summarized above, I do not believe Mr. Brown suffers from any disorder of sexual deviancy, including pedophilia.  The *DSM-5* indicates that pedophilia, over a period of at least six months involves "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children."  The *Manual* goes on to state that the individual must have "acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty." Finally, the *Manual* requires that the individual diagnosed must be at least 16 years of age and at least five years older than the child victim. While I am aware that Mr. Brown engaged in the behavior associated with the current case for more than six months, I believe that given his age at the time [55 and 56], and the absence of any previous evidence of pedophilic tendencies, despite long-standing access to both minors and to child pornography [via the Internet], it is more reasonable to understand his actions in this case as stemming from something other than sexual deviancy, as already discussed above. I strongly believe we would be seeing more evidence of such deviancy if it were actually present in Mr. Brown.

Both the Static-99R and the CPORT indicate an extremely low level of recidivism risk for Mr. Brown [around 3% based on the Static-99R]. In this regard, it is worth noting that research evidence indicates that only about five percent of all individuals convicted of being in possession of child pornographic images ever reoffend again. [These numbers are significantly higher for individuals who have been convicted of a hands on child sex offense in addition to a possession of child pornography offense.]

While it is beyond the scope of the current evaluation to assess what punishment Mr. Brown should receive for the actions associated with his offense related behavior, I believe the above summarized findings and conclusions represent very significant mitigating factors to be considered when pursuing efforts to arrive at a just sentence in this case. I am aware of the five-year mandatory minimum associated with his current charge. I am also aware of the possibility that but for his being a police officer, the original opportunity he was given to break off any additional involvement with downloading [or uploading] child pornographic images might well have served as a sufficient warning to achieve that goal, in a manner that would have precluded his involvement in this case, but for his being a police officer.  Given the distinct possibility that it was precisely this involvement - and the psychological harm it caused to him - that served as a major [and perhaps sole] factor in fueling this behavior, any further punishment would in effect represent an additional punishment for behavior fueled by harm incurred from an original effort to help others by becoming a police officer.

Anthony Mark Brown                                                April 28, 2022
Case No. 2:21-CR-00447-FMO                                      Page 23 of 23

While I do not view Mr. Brown as being at high risk for future sexual offenses, and while I do not view him as having active sexual deviancy, I do believe he is in need of meaningful mental health treatment, most importantly for his previously unrecognized and undiagnosed posttraumatic stress disorder, and for the depression and alienation he has come to experience over the course of his 36 years of work as a police officer. Upon the initiation of treatment, I believe a copy of this report should be provided to his primary treatment provider to familiarize them with the findings and conclusions documented in this report. In this regard, I believe Mr. Brown is currently receptive to participating in treatment, based on a growing recognition in him for the presence of these difficulties, and for his need to address them directly.

I hope the above information is helpful to you.  If you have any further questions, or if I can be of any further assistance please feel free to call or write.


Respectfully Submitted,

*Richard Romanoff*

Richard I. Romanoff, Ph.D.
Licensed Psychologist

RIR

# EXHIBIT B

# EXHIBIT B

June 23, 2022

Dear Judge Phillips:

At the outset, I want to express my deep remorse and shame regarding my conduct and my unconditional acknowledgment of my guilt and complete acceptance of responsibility.

As a former police officer, I spent a career helping vulnerable victims, kids, and the elderly. I want to express my deep understanding that, even though in my mind I was simply looking at pictures and engaging in totally inappropriate chat, I now realize every time someone accessed such pictures the child victims are victimized yet again. To realize that instead of helping such vulnerable people, I have actually victimized children is so painful for me. I do not have the ability to adequately express this in words. I am utterly humiliated.

I do not have and never have had a sexual interest in children. I was completely honest with Dr. Romanoff and I believe he has explained much better than I even understood at the time what I was going through during the pandemic.

Unfortunately, I have ruined my life and I must now pay a very high price. Even worse, my wife must also pay a high price in my absence. I am blessed that she understands me, has stood by me throughout this nightmare, and she will continue to be there for me.

Over the next years, I will have a lot of time to think about this and try to come to terms with the pain I have caused. Although it is said that there are very few things in life that are certain, I want to assure you that I will never engage in similar conduct. I have no doubt about this and I can only hope you will have the same belief.

Thank you for your consideration and understanding.

Respectfully,

Anthony Brown

4/14/2021
Kristin Brown
4714 Albury Ave
Lakewood Ca, 90713
08/22/1981

To whom it may concern,

I am writing about my husband, Anthony Brown (Tony), who is appearing in your court on a criminal sentencing.

I met Tony in 2001 while working at the Long Beach Airport as a TSA agent. I got to know him even better in 2009 when we started dating and then married him in 2012. I have a daughter from a previous marriage and she met Tony in 2009 when she was 8 years old. Since then, he helped raise her as his own. He went to her school functions such as track and cheered her on. He would take her back and forth to school when she needed a ride. He stood by her and encouraged her when she went to Sunburst Youth Academy for 6 months, which teaches them how to succeed in school and in life.  He surprised her with her first airplane trip which was to New York. After she got her driver's license he helped put a down payment on a car for her. Yes, he was hard on her sometimes and they had their moments but I know that all he ever wanted was the best for her. I could never see him looking at her any other way then a daughter to him. I trust him 100% with her. Tony is the type of person who would help anyone who needed it even without having to ask. My mother needed a new vehicle so she can get back and forth safely to work and he volunteered to put the deposit down and make the monthly payments for her which he has done for the last 5 years. If someone needs a loan he assists without question even if it meant that he'd be short on cash for that week. If he sees someone in trouble he stops to help. For example, we were on vacation in another state when we witnessed a vehicle jump a curb, run over a fire hydrant and hit a parked car. He immediately ran to the location to make sure everyone was ok. At that point, the citizen decided to try to drive off but couldn't because the fire hydrant was under the vehicle. The citizen then ran and he followed while reporting the situation to PD over the phone. If he sees a neighbor struggling to load something into their car he will stop what he is doing to assist. Just recently he noticed and older lady struggling to load a cabinet into her truck so he walked over and loaded everything for her and when he saw a young husband and wife trying to load and strap a large picnic table to their small vehicle he took it upon himself to put it in the back of his truck, drive it to their house and help carry it over their fence to put it in the backyard. I jokingly say that we are banned from going to pet shelters because every time we go we end up coming back with a new pet which is how at one time we had 7 dogs. He would feed the stray cats that would make our porch their temporary home, even buying them electric heated cat houses so they wouldn't be cold at night. There are doves that have continued to use one of our hanging plants to make a nest in so he would bring them food so they wouldn't have to go far looking for food while they took care of their babies. His heart is so big and doesn't want to see any living thing left behind or see someone struggling.

As you can see that what he is being charged of is out of character for him and a complete shock to me. He is a loving, helpful man. Family is everything to us and I will do everything in my power to help him move forward. Thank you for your time. If you have any questions please feel free to contact me. 562-537-0224

Thank you,

Kristin Brown

May 24, 2021

Jonathan L. Doma
400 W. Broadway
Long Beach, CA 90802
714-788-2563
July 2, 1963

To Whom It May Concern,

I am writing in reference to Anthony Brown, who is appearing before your court.

Anthony has requested me to write a character reference letter in this case, in which I have no hesitation in doing so.

I have always known Anthony to be of good character and standing within in the community. It may seem hard to believe in the given circumstances, but this is true nonetheless. I have known Anthony since joining a Special Detail at work since 2004. In these past 17 years we have become good friends and I have seen and shared with him some good times as well as bad times. I have faith and believe that he is a decent person at the core. He has been there for myself, many friends, and other constituents giving his time and finances when possible. He has offered an ear and his presence to help myself others in need. After meeting him you'll know that he is true and heart filled.

I have knowledge in identifying people's characteristics through my 27 years experience as a police officer and 21 years in the military and have being a First Sergeant of a Company. It is totally out of his character to be charged with such a crime. Anthony has always shown respect and dignity to adults and children. He has always been protective of children.

Thank you for your time.

Sincerely,

Jonathan L. Doma

April 8, 2021

Rev. Richard F. Austin Jr. (Ret LBPD Detective)
2870 Derrick Dr. Greenwood, Ca. 95635
(562) 760-9196
56 years of age

To Whom It May Concern,

My name is Rich Austin and I am a retired police detective from the city of Long Beach. I have known "Tony" since I became a reserve police officer in 1984 where he was already a reserve officer with at least a year more experience. Tony and I worked together for my first few months as my training officer and then later as my partner, mainly working the night shifts. We did this for six years.

Tony became a fulltime police officer about a year after I did in 1991. Tony and I have remained close friends and partners through our career until I lateraled to the El Dorado county Sheriff's office, in 2014. As police officers, it is a matter of life and death to trust your partner while working in a patrol car. I trusted Tony with my life. In 1994, I filed for divorce and was not doing well. One night, I came into work a graveyard shift and I just could not work my shift. I was very emotional and new I should not be in a patrol car and not have my mind on work. I spoke to my supervisor and asked to go home, which everyone knew, was not my character. Tony was there that night and saw I was in distress. Tony asked if I was OK and if I was going home. I found early on, that long drives, no matter the time or place always help me to clear my mind. I had decided to drive to the Grand Canyon that night. When I told Tony, without hesitation, he said, "I'm going with you". We left close to midnight and arrived the next morning with it snowing. During the drive, Tony talked with me, reminded me of whom I am and I will get through it, kept me motivated, and was there during one of my most trying moments of my life. I can count on one finger, who at that time would have done such a thing for me. Tony is family and has been to my parents' home, and ate at my table, and I have been to his.

In 2014, soon after my transfer to El Dorado county Sheriff's office, I was diagnosed with Moderate PTSD. My doctors and counselors have agreed I had the beginning stages of this, 20 years ago. I had no choice but to retire from a job I loved, but my heart and soul would not let me continue in that capacity. Since then, I have made it my mission to learn everything about PTSD and now speak to other agencies and individuals about surviving this injury. I am now a Reverend and believe this is my mission from God to help others who are suffering. Many who don't know they are suffering from PTSD choose different ways to subdue the feelings and pain of PTSD. Some choose good way's, others choose the wrong way and some even commit suicide. (Documented) Tony and I, along with many of our other police family members know this all too well. But, if I was told today, that I had to return to police work, and Tony was my partner, and knowing Tony is being charged with a serious crime, I would not hesitate for a moment. I consider Tony family, and a brother.

Sincerely and Respectfully,

Rev. Richard F. Austin Jr. (Ret LBPD Detective)

Current: Deputy Probation officer (Field) Assigned to the Community Corrections Center (CCC) Felony Unit. County of El Dorado

May 23, 2021

James F. Winnen (Ret LBPD Police Officer)
183 Winding Rock Rd
Goose Creek, SC 29445
(562) 708-9315
59 Years Old

To Whom it May Concern,

My name is James F. Winnen a retired police officer with the City of Long Beach. I have known Anthony
(Tony) Brown for approximately 31 years. Tony and I first met when I was going through the Long Beach
Police Departments Level 1 Police Reserve Academy Class 27. Tony was my Instructor/TAC Officer. After
Completion of the academy Tony and I became partners and he was my Field Training Officer (FTO). I
learned a lot from him.

Tony and I worked together for approximately 1 ½ years before I entered the Long Beach Police
Departments Basic Police Academy and became a full-time police officer. During the time working with
Tony our working relationship developed into a great friendship. Tony was a great and trustworthy
partner and a great friend. I trusted my life with him. He was dependable and going into any situation I
knew he had my back.

Over the years my friendship with Tony has become one of my brother/best friends and a part of my
family. When I was going through my divorce Tony was there to lend a shoulder to listen and be there. I
moved to South Carolina back in 2010. I have been here for approximately 11 years. Tony has been the
only friend who has gone out of his way to come and visit me. That has meant a lot to me. That is what
kind of person he is. In 2019 I came out to California for a visit and Tony opened his home to me and
treated me as family.

I know Tony is being charged with a serious crime and it was shocking to hear the charges against him. I
have a son and daughter and they grew up with Tony being a part of our family. I trusted him around my
children. They treated him not only as a great family friend but family. Tony has been a truly great
friend/brother and family member and an important person in my life. Thank you.

Sincerely and Respectfully,

James F. Winnen (Ret LBPD Police Officer)

This letter is written by Scott V. Niemczewski on behalf of LBPD Officer Anthony Brown. I am a U.S. Customs & Border Protection Import Specialist assigned to the Long Beach / LA Seaport since 2008.

I worked with Officer Brown from 2002 to 2008 at the Long Beach Airport as a Supervisory Transportation Officer and as a Manager as well.

I don't know all the specifics but what I do know is Officer Brown in the 6 years I worked with him on morning shift or swing shift exhibited the upmost integrity and honesty. We encountered many alleged criminal passengers together. Most if not all of these passengers that we got involved with for the airlines were either carrying narcotics or misbehaving. All of the others were just moving thru just like normal people.

Officer Brown never displayed any behavior that would indicate there were any issues in his personal life. I remember when Officer Brown lost his Mother and I shared time with him having breakfast while he shared time with me and his feelings. It was very difficult to listen to. Officer Brown and I shared breakfast and lunch many times and being a good judge of character myself I NEVER observed any behavior that would raise a red flag.

Officer Brown's wife Kristen was a person I Supervised at TSA and they were not married at that time however, knowing what I know about her character she would never marry someone that was of questionable character. She was the best of the best.

Officer Brown's involvement with my cases during the time I worked with him are too numerous to recall and if needed could be recalled for additional evidence to acquit this good man. In my opinion this Officer is not perfect just like the rest of us however, he is not capable of committing crimes at all. He is my friend and counterpart.


Scott V. Niemczewski

04/28/2021

17518 Norwalk Blvd.

Artesia, CA. 90701

Phone Number: 562- 481-7955

Debra L Scott

5751 Del Amo Blvd

Lakewood, Ca 90713

562-221-7848

May 25, 1954

To whom it may concern,

I am writing this letter on behalf of my son-in-law (Tony) Anthony Brown, who is appearing in your court on a criminal charge.

I met Tony in 2001 at the Long Beach Airport. I worked at Hertz Car Rental and he was a Long Beach Police Officer stationed at the airport. While working at Hertz myself and my co-workers would have to call the police over many times. We would have very unruly customers, some using stolen credit cards, fake ID's and fake make to make fraudulent rentals. Tony would usually be one of the first officers to arrive to handle the situation which would make me very relieved and less stressed. He was always very professional as to not escalate the problem but to resolve it. Tony many times would wait in his patrol car outside the rental car building at closing to make sure we were all safe leaving at night. I always saw Tony to be nothing but professional in his job performance at the airport. He could also be quite funny at times.

In about 2009 Tony and my daughter, Kristin, who also worked at the airport as a TSA agent, began dating. In 2012 they were married. I have never seen such a perfect couple. They love doing everything together. They take vacations, go to baseball games, county fairs, eating out and much more. I have never had my daughter tell me she was unhappy with Tony. They show nothing but love and support for each other. I am so jealous; Tony even walks Kristin out to her car in the early morning hours when she goes to work to make sure she is safe. Tony has also been a wonderful, loving son-in-law to me, I couldn't ask for anyone better. One of the many examples I have is one day my daughter and Tony were checking their finances and Kristin said we have some extra money left over. Tony told her why don't we buy your mom a car since she needs one. So they did, they leased me my very first new car. I couldn't believe it, I still don't believe it!

I know what Tony is accused of is totally out of character according to how I described him, but I believe in his goodness and love of family and friends. I am standing by Tony without hesitation as he goes thru this process and proceedings.

I want to thank you for reading my letter. Please feel free to contact me if you have any questions.

Yours Sincerely,

Debra L. Scott

Jack D. Scott

Del Amo Blvd

Lakewood CA 90713

562-209-4263

To whom it may concern,

I, Jack Scott am writing you this letter in behalf of my brother- in- law Anthony Brown (Tony) who is appearing in your court for a criminal charge.

I first met Tony in the early 2000's when I worked at the restaurant at the Long Beach Airport where he was also stationed. In my 16 years working at the restaurant as a waiter and bartender I had to call for police assistance many times for unruly, intoxicated customers, or when someone would walk out on their bill or leave a bag attended. Tony would show up and was always professional and do his best to resolve the problem. When Tony and the other officers would come in for lunch we would try to pay for them to show our appreciation and they would always deny the offer.

In 2009 I got to know Tony on a more personal level, my sister and Tony started dating. I have never seen my sister more happy. Even to this day I have never seen them fight or argue in their 9 years of marriage.

In my close to 20 years of knowing Tony I can tell you this, he will be the first to help you out even if you don't ask. He has always helped out my family and has never asked for anything in return. He has been nothing but good in my eyes. As long as I have known him, he has always followed the law. Being around him makes me want to always do the right thing. I can honestly say I can't think of one bad thing to say about him.

I know what he is being charged with is completely out of character and stand by him 100%. I know he has a good and loving heart for his family and friends. I have seen nothing but good from him in all of the years that I have known him and I am grateful he is apart of my family. I have always seen him uphold the law on duty as well as off.

I want to thank you for taking the time to read this letter. Please feel free to contact me if you have any questions.

Sincerely,

Jack D. Scott

April 5, 2021

Tom Romin
6691 Ruby Giant Ct.
Eastvale, CA 92880

To Whom it May Concern:

I am writing to vouch for the character of my lifelong best friend, Tony Brown, who faces criminal charges before your court. Tony and I have been the best of friends since we were both about 13 year's old. Our birthdays are just one day apart and both of us were born the same year.

Tony's parents treated me as one of their family members from the age of 13 to when I moved from Long Beach around age 23. I spent countless hours at his home, after school and on weekends. I was over there about every holiday including Thanksgiving and Christmas. Tony was not only my best friend but like a brother to me. I spent thousands of hours with him and his family.

Tony had asked me to write a character reference letter for this case. The truth is that I had already thought of doing so before he made the request. My hope is that this letter will help better define Tony as the person I have known practically my whole life.

Tony is a man of good moral character. Ever since we were in our late teens, his dream was to become a police officer. He would tell me of all the good things of being an officer meant to him, such as enforcing the law, putting criminals in jail, doing the right thing on and off duty, and honoring his badge if he were to make the Long Beach Police Department.

From the age of 13 until I moved away from the Long Beach area, we were inseparable. I knew him better than most everyone. We were best friends and still to this day keep in touch on a regular basis.

Tony and I had a mutual friend growing up. We knew this friend from right around the age of 10 or so from what I recall. This mutual friend was my best friend until I met Tony near the age of 13. I stopped hanging around this friend because he liked getting into trouble. Nothing serious but I felt that if I continued hanging around this friend, then I would start getting into trouble too. I did not fully realize the impact this friend could have on me until I met Tony, and Tony pointed out to me that if I continued hanging around this friend that I would start misbehaving like him. Tony was right. The older our mutual friend got, the more trouble he got into.

Tony had this insight from a very young age. He had a good home life with parents that instilled good manners in him and a great sense of right and wrong. He never ever was one to get into trouble as a child and that carried through to his adult life. His standards as a Long Beach Police Officer have always been top notch! He has always worn his badge with pride and dedication.

This lone instance of our misbehaving mutual childhood friend told me the character of Tony and the maturity of him even at a very young age. He knows right from wrong. As you can see, it is totally out of character to be under these charges. These allegations come to a complete shock to me. His behavior has been nothing short of exemplary, even as a teen, and to this day. He has been the best friend. He would do anything for anyone. He is caring and giving and really a role model in my eyes!

These charges have devasted him and his family. He swore to uphold the law and his badge, and whatever happened does not define who he is as a person! This is NOT the Tony I know.

I hope you will take into consideration the future of my best friend, Tony Brown, and him being an exemplary human being. I implore you to make a fair decision because, as you well know, he has never ever been in any type of legal trouble. One charge surely cannot and does not define this terrific man! He is loved deeply by his family, his friends, and including myself!

If you wish to verify any of the above statements, please do not hesitate to call me at 951-264-3199. I look forward to help clearing the name of this fine Long Beach Police Officer, but more importantly, this valuable member of the Long Beach community which he has deep roots and much love for.

Thank you.

Yours sincerely,


Tom Romin

June 6, 2021

5225 Beran Street
Torrance, CA.  90503

Ronney: 12/7/1955
Carolyn: 11/1/1961
Susan: 09/26/2002

To Whom It May Concern:

Ronney:  I Ronney Wong met Tony Brown  (Anthony) at the Long Beach Airport where he was assigned to the LBPD Airport Detail.  I met Tony  Brown (Anthony) while working at the Long Beach Airport approximately 17 years ago.

Carolyn and Susan:  Both Carolyn and Susan met Tony Brown (Anthony) through Ronney Wong as they worked together from approximately 17 years ago.

Tony has always shown that he knows what is right and what is wrong.  This evidenced by working with him on a daily basis at the airport.  We handled many calls for service and Tony always followed the letter of the law.  He never wavered from those principles.  My family and I have spent a great many hours socially with Tony, camping, dinners and many family events. Tony never acted in a disrespectful way to either myself, my wife or my daughter.

Tony has never shown to be capable of committing any crimes or breaking any laws.  We consider Tony to be a valuable and reliable friend and part of our family now.

Sincerely yours,
Ronney S. Wong
(310) 384- 3156

Carolyn Oliver-Wong

Susan L Oliver-Wong

# EXHIBIT C

# EXHIBIT C

1    **DECLARATION OF JACK DONSON**

2    I, Jack Donson, hereby declare under penalty of perjury that the following is true

3    and correct.

4    STATEMENT OF EXPERTISE

5    1.  I am the Founder of My Federal Prison Consultant, which I started after retiring

6    from the Federal Bureau of Prisons (BOP). I provide Continuing Legal Education

7    (CLE), consulting and expert testimony on federal prison issues. I have worked with

8    federal offenders for over 33 years and have testified in district courts throughout the

9    country relative to federal prison issues. In the past several years, I have been asked to

10   review inmate records for numerous Incarceration Reduction Amendment Act (IRAA),

11   Second Look and Compassionate Release petitions and offer my opinion on

12   adjustment, classification, and correctional treatment.

13   2.  I have been employed within the field of criminal justice for more than 35 years,

14   with 23 years employed by the BOP working in classification, correctional programs

15   and treatment. I am active in following policy initiatives and routinely attend

16   conferences, such as the annual U.S. Sentencing Commission Conference, which

17   provides training by BOP staff on federal prison issues and processes. During my

18   career, I managed a case load as a Correctional Treatment Specialist. I was responsible

19   for inmate counseling, security classification, program placement/evaluation and re-

20   entry. I have worked in Minimum (camp), Low, Medium, Administrative (pre-trial and

21   high security), and Witness Security units.

22   3.  My skill set is unique, policy focused, and has been molded by daily, direct

23   interactions with inmates in the trenches of the Federal prison system. This continues

24   even today through Corrlinks correspondence with current inmates, visiting facilities

25   around the U.S., and my pro bono capacity for FedCURE as their National Director for

26   Inmate Programs and Services. In this role, I have interacted with BOP central office

27   staff regarding prison issues and have even been solicited for my feedback on BOP

28   related legislation.  I hold a bachelor's degree in Sociology/Anthropology and a

1

1    Master of Science Degree in Criminal Justice. Aside from consulting, I was a Lecturer
2    at Marywood University for several years and taught three different Criminal Justice
3    courses, including one entitled *The American Prison*.

4                                       SCOPE OF REVIEW

5    4.    I have reviewed the pre-sentence Investigation Report (PIR), factual resume and
6    plea agreement related to Anthony Brown.   I offer the following professional opinions
7    regarding Mr. Brown's classification, designation, and correctional treatment issues.

8                                         CLASSIFICATION

9    5.    As the Court is aware, the BOP classifies facilities into several categories including
10   Minimum security (camp), Low and Medium security (Federal Correctional Institutions)
11   High security (U.S. Penitentiaries) and Administrative (MCC/MDC/FDC & Medical
12   Centers). In recent years, the agency has developed "satellite" low facilities and
13   specialized restrictive housing unit programs such as special management units,
14   communication management units and reintegration units. Inmates are classified based
15   on a point system and Public Safety Factors (PSF's) to determine the required level of
16   control and supervision needed for facility placement. Some of the major factors in
17   determining the security points are derived from an offender's history of violence,
18   escape, criminal history points, pending charges and age.   In Mr. Brown's case, I have
19   estimated he only has two security points which are ordinarily commensurate with
20   minimum security; however, the instant offense involves a sex offense, so he is assigned
21   a PSF that precludes minimum, "camp" placement.   Low security facilities house
22   inmates with more of a criminal orientation and inmates serving sentences over ten
23   years.

24                                         SEX OFFENDERS

25   6.    Sex offenders and cooperators are two of the most victimized populations in
26   federal prison. Upon arriving at the designated facility, new inmates are approached by
27   other inmates to "*show their papers*" in an informal vetting process which is done to
28   identify sex offenders and cooperators. At one point, the BOP changed the policy on

                                                2

inmates possessing their PIR's to inhibit the vetting process; however, PACER and the internet make it extremely difficult for one to hide their crime and/or cooperation. I witnessed this vetting process throughout my career and the disruptions it caused in a correctional environment. Inmates without prior prison experiences often request protective custody when approached. If they make it through this initial vetting process, they are usually ostracized by the general population by being pressured to eat in specific areas of the dining hall and prohibited from entering TV rooms and recreation areas. I have had inmates on my caseload, and more recently clients, tell me that they have paid extortion for protection. While secure federal correctional institutions are not as violent and predatory as the penitentiaries, the vetting process, ostracization, and subtle victimization from the inmates in the general population create an atmosphere of mental anguish for sex offenders. The vetting process has risen to the concern of the agency as recent as November 18, 2020, when an infraction was added to the inmate disciplinary code as follows: "HIGH SEVERITY LEVEL PROHIBITED ACTS 231 *Requesting, demanding, pressuring, or otherwise intentionally creating a situation, which causes an inmate to produce or display his/her own court documents for any unauthorized purpose to another inmate*."

## LAW ENFORCEMENT OFFICERS

7.    The BOP tracks former law enforcement officers within a system referred to as The Central Inmate Monitoring System (aka: CIM). Like sex offenders, former law enforcement officers are vulnerable population because of the animosity many inmates have towards that occupation. It has been my experience that former law enforcement officers are designated far from the area where they worked and are often designated outside the 500-mile policy perimeter which is the mileage in which the agency attempts to place inmates to their families.

## GENERAL PROTECTIVE CUSTODY UNIT ISSUES

8.    Sex offenders and former law enforcement officers react differently within the secure federal prison environment, so it is difficult to assess how Mr. Brown will adjust in

3

environment given his post-traumatic stress disorder and depression. Inmates who voice a concern for their safety in federal prison are placed in the special housing unit for protective custody while an investigation is conducted to verify the threat. However, it is common for investigators to order inmates back into the general population if the perceived threat is relative to the vetting process and/or the general fear and anxiety a sex offender faces in prison. If the inmate refuses to return to the population, staff issue incident reports for "*Refusing to Accept a Program Assignment*." Repeated refusals to enter the general population results in the disciplinary segregation, the loss of good time and a cycle of institutional transfers. Since retiring from the BOP, I worked with a sex offender at a low security facility who was threatened to "*watch his back*" when inmates in the population discovered the nature of his offense. He reported the threat to staff but was not placed in protective custody. He was eventually assaulted resulting in the dislocation of his jaw.

9.      To alleviate the unnecessary placement of inmates isolated in protective custody, the BOP developed a pilot program referred to as a "*Re-integration Unit*" and then expanded the concept to three facilities in 2016. It is described in policy as: "*The RHU targets male inmates identified as verified or unverified protective custody cases, who consistently refuse to enter general population, ordinarily at multiple locations.*"

ONCLUSION

10.     Mr. Brown has a difficult challenge ahead in adjusting to a secure prison environment as both a sex offender and former law enforcement officer. While he will not be housed in a medium or high security facility, there are still some of the more predatory aspects within the prison subculture in a low security FCI. If he handles the pressures of the initial vetting process, his time served in federal prison will be more stressful and difficult than the court may be aware of given his crime and former occupation. The daily stress and anxiety suffered in a controlled prison environment has the potential for exacerbating mental health issues and impacting institutional adjustment. In my professional opinion, the court should consider making a recommendation for the

4

1  designation to a federal prison camp or at least the placement in a facility with a sex

2  offender treatment program (SOTP). FCI Englewood has the SOTP and the low security

3  facility at FCI Peterburg has a SOTP has one at the same complex so there are a

4  substantial amount of sex offenders at both facilities and provide safer environments.

5  Any recommendation for designation is not binding on the agency but would be

6  considered in accordance with BOP policy and in respect for the court.  Therefore, it is

7  recommended the following language be used as a guide for a practical judicial

8  recommendation:

> *"The court recommends the designation to any appropriate federal prison camp*
> *and apply the "Lesser Security" management variable based on his former*
> *capacity as a law enforcement officer and lack of a criminal history or institutional*
> *experience. If the BOP does not comply with camp placement, FCI Englewood,*
> *Colorado or alternately FCI Petersburg, Virginia. if Englewood is unavailable.  If*
> *the BOP is unable to comply with this recommendation, the court requests a letter*
> *explaining the reason for the non-compliance."*

Executed on this 26th day of June 2022 in Dingmans Ferry, PA.

JACK T. DONSON

5